1  MORGAN, LEWIS & BOCKIUS LLP
   Christopher J. Banks, Bar No. 218779
2  christopher.banks@morganlewis.com
   Samson C. Huang, Bar No. 273785
3  samson.huang@morganlewis.com
   300 South Grand Avenue
4  Twenty-second Floor
   Los Angeles, California  90071-3132
5  Telephone: +1.213.612.2500
   Facsimile:  +1.213.612.2501
6
   Attorneys for Defendant,
7  CHARTER COMMUNICATIONS, INC.

8

9

10              UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12

13  TERESA DYKZEUL,                    Case No. 2:18-cv-05826 DSF (GJSx)
                                       Assigned to Hon. Dale S. Fischer
14              Plaintiff,

15       vs.

16  CHARTER COMMUNICATIONS          **DEFENDANT CHARTER
    INC.,                           COMMUNICATIONS, INC.'S
17                                  POST-TRIAL CLOSING
                Defendant.          ARGUMENT BRIEF**
18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     THE TRIAL ........................................................................................................ 4

III.    STATEMENT OF FACTS ................................................................................. 5

    A.    Dykzeul Applied At Charter To Work As A DSR, A
        Challenging Job That Experienced Frequent Turnover ...................... 5

    B.    Dykzeul Applied For The DSR Job At Charter Knowing It
        Required Friday Evening And Weekend Work, Representing
        That She Was Available Those Times ................................................ 7

    C.    The *Only* Reason Swift Did Not Hire Dykzeul Was Because She
        Could Not Work On Saturdays ........................................................... 9

    D.    DSRs Who Reported To Swift As Of October 2015 Were
        Required To Work On Saturdays ..................................................... 13

    E.    Other Accommodations Proposed By Dykzeul In This
        Proceeding Also Would Have Imposed An Undue Hardship ........... 15

    F.    Dykzeul's Subsequent Employment History Shows That She
        Was Unlikely To Work At Charter Long, Even If She Had Been
        Hired As A DSR ............................................................................... 17

IV.     LIABILITY ...................................................................................................... 22

    A.    Legal Framework ............................................................................ 22

    B.    Charter Could Not Accommodate Dykzeul's Inability To Work
        All Saturdays Without Undue Hardship .......................................... 23

        1.    *Working Saturdays Was A Requirement For DSRs In*
            *October 2015 When Dykzeul Applied* ................................. 25

        2.    *Exempting Dykzeul From Working Friday Evenings and*
            *Saturdays and Adjusting Her Performance Goals Would*
            *Have Resulted in Lost Efficiencies* ...................................... 28

        3.    *Dykzeul Could Not Work Sundays Instead Of Saturdays*
            *Without Undue Hardship Because Her Supervisor Would*
            *Have To Work On His Only Day Off* ...................................... 32

        4.    *Dykzeul Could Not Work Longer Hours On Weekdays*
            *Without Undue Hardship Because Charter Would Suffer*
            *Lost Efficiencies* ................................................................. 35

C. Charter Did Not Intentionally Discriminate Against Dykzeul Because Of Her Religion Or Religious Beliefs ................................. 36

V. DAMAGES .......................................................................................... 39

A. Back Pay .................................................................................. 39

1. Dykzeul's Post-Charter-Application Earnings ......................... 39

2. Average Turlock DSR Earnings Should Be Used To Estimate Dykzeul's Lost Earnings, Not Puffery From A Job Advertisement As Advocated By Her Expert In His First Two Damages Models ..................................................... 40

3. Dykzeul's Third Damages Model Should Be Disregarded Because It Utilizes Unreliable Methodology Based On Unrepresentative, Cherry-Picked Data .................................... 45

4. Dykzeul's Damages Models Also Inflate The Value Of Her Alleged Lost Benefits From Charter ................................. 46

5. Dykzeul Fully Mitigated Her Economic Losses By 2017 ......... 47

6. The Court Should Cut Off The Back Pay Period No Later Than October 2017 When Dykzeul Secured A Higher-Paying And Substantially Equivalent Position .......................... 49

7. Dykzeul Failed To Exercise Reasonable Care To Maintain Substantially Equivalent Employment ..................... 53

8. Summary Of Back Pay Calculation ......................................... 55

B. The Court Should Deny Dykzeul's Request For Prejudgment Interest Because The Amount Of Her Damages Were Not Readily Ascertainable ............................................................... 55

C. Dykzeul Did Not Suffer Any Serious Emotional Distress ................. 59

D. The Evidence Does Not Support An Award Of Punitive Damages ................................................................................... 61

VI. CONCLUSION ................................................................................... 65

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

## TABLE OF AUTHORITIES

### Cases

*Abila v. Amec Foster Wheeler USA Corp.*,
  216 F. Supp. 3d 778 (S.D. Tex. 2016) ...................................................49

*Alexander v. Cmty. Hosp. of Long Beach*,
  46 Cal. App. 5th 238 (2020)...........................................................50, 52

*Am. Fed'n of State, Cty., & Mun. Emps., AFL-CIO (AFSCME) v. State of Wash.*,
  770 F.2d 1401 (9th Cir. 1985)........................................................36

*Ansonia Bd. of Educ. v. Philbrook*,
  479 U.S. 60, 107 S. Ct. 367, 93 L. Ed. 2d 305 (1986).........................24

*Arteaga v. Brink's, Inc.*,
  163 Cal. App. 4th 327 (2008).........................................................39

*Bains LLC v. Arco Prod. Co., Div. of Atl. Richfield Co.*,
  405 F.3d 764 (9th Cir. 2005)..........................................................64

*Balint v. Carson City, Nev.*,
  180 F.3d 1047 (9th Cir. 1999)....................................................24, 63

*Berry v. Dep't of Soc. Servs.*,
  447 F.3d 642 (9th Cir. 2006)..........................................................23

*Bhatia v. Chevron U.S.A., Inc.*,
  734 F.2d 1382 (9th Cir. 1984)....................................................24, 63

*Blankenship v. Liberty Life Assurance Co. of Boston*,
  486 F.3d 620 (9th Cir. 2007)..........................................................59

*Brady v. Thurston Motor Lines, Inc.*,
  753 F.2d 1269 (4th Cir. 1985)....................................................53, 54

*Bruff v. N. Mississippi Health Servs., Inc.*,
  244 F.3d 495 (5th Cir. 2001)..........................................................25

*Bullock v. Philip Morris USA, Inc.*,
  198 Cal. App. 4th 543 (2011).........................................................59

*Burns v. S. Pac. Transp. Co.*,
  589 F.2d 403 (9th Cir. 1978)..........................................................24

*California Fair Employment & Housing Com. v. Gemini Aluminum Corp.*, 122 Cal.App.4th 1004 ...................................23

*Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*,
    439 F.3d 894 (8th Cir. 2006)................................................................63

*Caudle v. Bristow Optical Co.*,
    224 F.3d 1014 (9th Cir. 2000)..............................................................53

*Chrysler Corp. v. Mann*,
    561 F.2d 1282 (8th Cir. 1977)..............................................................33

*Cook v. Chrysler*,
    981 F.2d 336 (8th Cir. 1992)................................................................25

*Cook v. Lindsay Olive Growers*,
    911 F.2d 233 (9th Cir. 1990)................................................................22

*Costa v. Desert Palace, Inc.*,
    299 F.3d 838 (9th Cir. 2002), *aff'd*, 539 U.S. 90, 123 S. Ct. 2148 (2003)...........64

*Domingo v. New England Fish Co.*,
    727 F.2d 1429 (9th Cir. 1984)..............................................................56

*Donlin v. Philips Lighting N. Am. Corp.*,
    581 F.3d 73 (3d Cir. 2009)..................................................................50

*Donnelly v. Yellow Freight Systems, Inc.*,
    874 F.2d 402 (7th Cir. 1989)..............................................................56

*E.E.O.C. v. Accurate Mech. Contractors, Inc.*,
    863 F. Supp. 828 (E.D. Wis. 1994)........................................................56

*E.E.O.C. v. Delight Wholesale Co.*,
    973 F.2d 664 (8th Cir. 1992)..............................................................53

*E.E.O.C. v. Freeman*,
    778 F.3d 463 (4th Cir. 2015)..............................................................46

*EEOC v. Dalfort Aerospace, L.P.*,
    2002 WL 255486 (N.D. Tex. Feb. 19, 2002)..........................................34

*EEOC v. Firestone Fibers & Textiles Co.*,
    515 F.3d 307 (4th Cir. 2008)..............................................................25

*Eversley v. MBank Dall.*,
    843 F.2d 172 (5th Cir. 1988).........................................................33, 34

*Ford Motor Co. v. EEOC*,
    458 U.S. 219 (1982).....................................................................50, 52

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

iv

*Gaffney v. Riverboat Servs. of Indiana, Inc.*,
   451 F.3d 424 (7th Cir. 2006) .................................................................. 51

*Guz v. Bechtel Nat'l, Inc.*,
   24 Cal. 4th 317, 358 (2000). ................................................................. 38

*Harrell v. Donahue*,
   638 F.3d 975 (8th Cir. 2011) ............................................................ 24, 33

*Hetzel v. Cty. of Prince William*,
   89 F.3d 169 (4th Cir. 1996) ................................................................... 59

*Johnson v. Spencer Press of Maine, Inc.*,
   364 F.3d 368 (1st Cir. 2004) ................................................................. 54

*Knickerbocker Plastics Co.*,
   132 NLRB 1209 (1961) ......................................................................... 55

*Kolb v. Goldring, Inc.*,
   694 F.2d 869 (1st Cir. 1982) ................................................................. 51

*Kolstad v. Am. Dental Ass'n*,
   527 U.S. 526, 119 S. Ct. 2118 (1999) ......................................... 61, 62, 64

*Lee v. ABF Freight System, Inc.*,
   22 F.3d 1019 (10th Cir. 1994) ............................................................... 24

*Leff v. Gunter*,
   33 Cal.3d 508 (1983) ............................................................................ 58

*Madsen v. Associated Chino Tchrs.*,
   317 F. Supp. 2d 1175 (C.D. Cal. 2004) ................................................. 22

*Maksymchuk v. Frank*,
   987 F.2d 1072 (4th Cir. 1993) .............................................................. 56

*Navarro v. DHL Glob. Forwarding*,
   No. CV15-5510-CAS(EX), 2017 WL 11647704 (C.D. Cal. Dec. 22, 2017) ....... 58

*Nordquist v. Uddeholm Corp.*,
   615 F. Supp. 1191 (D. Conn. 1985) ...................................................... 51

*Opuku-Boateng v. State of Cal.*,
   95 F.3d 1461 (9th Cir. 1996) ........................................................... 24, 31

*Palasota v. Haggar Clothing Co.*,
   499 F.3d 474 (5th Cir. 2007) ........................................................... 50, 53

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Parker v. Twentieth Century–Fox Film Corp.*,
  3 Cal.3d 176 (1970)..................................................................................53

*Passantino v. Johnson & Johnson Consumer Prod., Inc.*,
  212 F.3d 493 (9th Cir. 2000)...........................................61, 62, 63, 64

*Patterson v. P.H.P. Healthcare Corp.*,
  90 F.3d 927 (5th Cir. 1996).....................................................................53

*Peinado v. S. Pac. Transp. Co.*,
  No. C-92-545 MHP, 1996 WL 449184 (N.D. Cal. July 31, 1996).....................56

*Praseuth v. Rubbermaid, Inc.*,
  406 F.3d 1245 (10th Cir. 2005)..............................................................63

*Roodenburg v. Pavestone Co., L.P.*,
  171 Cal. App. 4th 185 (2009).................................................................58

*Sagadin v. Ripper*,
  175 Cal. App. 3d 1141 (1985)................................................................59

*Sellers v. Delgado Cmty. Coll.*,
  839 F.2d 1132 (5th Cir. 1988)...............................................................50

*Stanchfield v. Hamer Toyota, Inc.*,
  37 Cal. App. 4th 1495 (1995).................................................................54

*Stephens v. C.I.T. Grp./Equip. Fin., Inc.*,
  955 F.2d 1023 (5th Cir. 1992)...............................................................50

*Sturgill v. United Parcel Serv., Inc.*,
  512 F.3d 1024 (8th Cir. 2008)...............................................................63

*Thorne v. City of El Segundo*,
  802 F.2d 1131 (9th Cir. 1986)...............................................................50

*Tiano v. Dillard Dep't Stores, Inc.*,
  139 F.3d 679 (9th Cir. 1998)..................................................................23

*Tooley v. Martin-Marietta Corp.*,
  648 F.2d 1239 (9th Cir. 1981)...............................................................32

*Trans World Airlines, Inc. v. Hardison*,
  432 U.S. 63, 97 S. Ct. 2264, 53 L. Ed. 2d 113 (1977)..............................passim

*Tudor v. Se. Oklahoma State Univ.*,
  13 F.4th 1019 (10th Cir. 2021)..............................................................50

*U.S. Equal Employment Opportunity Comm'n v. Consol Energy, Inc.*,
    860 F.3d 131 (4th Cir. 2017).....................................................................61

*Vaughn v. Waffle House, Inc.*,
    263 F. Supp. 2d 1075 (N.D. Tex. Mar. 5, 2003)......................................33

*Veronese v. Lucasfilm Ltd.*,
    212 Cal. App. 4th 1 (2012)........................................................................38

*Virts v. Consol. Freightways Corp. of Delaware*,
    285 F.3d 508 (6th Cir. 2002).....................................................................25

*Watlington v. University of Puerto Rico*,
    751 F. Supp. 318 (D. Puerto Rico 1990)..................................................51

*Webb v. City of Philadelphia*,
    562 F.3d 256 (3d Cir. 2009)......................................................................24

## **Federal Statutes**

Title VII of the Civil Rights Act of 1964 ...........................................passim

42 U.S.C. § 1981a(b)(1) ....................................................................61

42 U.S.C. § 2000e(j)..........................................................................22

42 U.S.C. § 2000e–2(a) .....................................................................22

## **California Statutes**

California Fair Employment and Housing Act ("FEHA")...............passim

Cal. Civ. Code § 3287(a) ...................................................................57

Cal. Gov't Code § 12926(u) ..............................................................24

Cal. Gov't Code § 12940(a) ..............................................................22

Cal. Gov't Code § 12940(l) ...............................................................22

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

vii

## I.      **INTRODUCTION**

In October 2016, Plaintiff Teresa Dykzeul ("Dykzeul") applied for a position as a Direct Sales Representative ("DSR") with defendant Charter Communications, Inc. ("Charter") in the region around Turlock, California.  Although the person who interviewed her, Charter Direct Sales Supervisor Jim Swift, was otherwise impressed with Dykzeul and wanted to hire her, he ultimately did not do so because Dykzeul was unable to work Saturdays, which was a requirement for the position.

Dykzeul contends now that Swift's decision was based on intentional discrimination against her religion and that his conclusion that the accommodation that Dykzeul proposed – to allow her to work Sundays instead – would impose an undue hardship on him and Charter constituted an unlawful failure to accommodate.  But the evidence at trial showed Dykzeul's claims lack merit.  In particular, Dykzeul not only failed to introduce a shred of evidence that Swift or Charter were motivated by animus or ill will towards Dykzeul's religion, she actually stipulated before trial that the "only reason that Swift did not hire Dykzeul was because she could not work Saturdays."  Swift's decision was based solely on her unavailability on Saturdays, as Dykzeul stipulated, and not because he harbored prejudice against her religion.

As for Dykzeul's claim for failure to accommodate, the preponderance of evidence establishes that in October 2015, DSRs who worked in the territories overseen by Swift (Turlock, Gilroy and San Luis Obispo) were required work on Saturdays.  That did not mean they could not occasionally be excused from a Saturday or would be subjected to discipline if they missed a Saturday; but rather they had to be *available* to work Saturdays to be eligible for the job and that, unless they had hit their sales targets the prior month and were on target to hit their sales targets the current month, they could not be excused from working on a Saturday. Dykzeul, however, was not available to work on *any* Saturdays, and this posed a problem for Swift.

1    Swift liked Dykzeul and wanted to hire her, so he spent the weekend after her

2  Friday interview trying to think of a way to work around Dykzeul's Saturday

3  unavailability.  During the interview, Dykzeul suggested she work Sundays instead,

4  and, indeed, Swift did *occasionally* permit a DSR to work on a Sunday.  However,

5  in Swift's and those DSR's experiences, including the experience of former DSRs

6  Daniel Blond and Krystyna Amaral (both trial witnesses), Sundays were simply not

7  good sales days and not an adequate substitute for Saturday work.  Moreover, if a

8  DSR worked on a Sunday, Swift had to be on call during the time the DSR worked

9  to answer questions and respond to emergencies.  Swift already worked six days a

10  week, and he determined it would be an undue hardship on him if he had to work

11  every day of *every* week, all year long.  Thus, Swift decided he could not

12  accommodate Dykzeul by allowing her to swap Saturdays with Sundays and .

13  proposal and did not hire Dykzeul.

14    At trial, Dykzeul proposed other potential accommodations that she claims

15  could have been considered, such as allowing her to start early on weekday

16  mornings or work part-time, or by hiring another employee part-time to cover her

17  Saturdays or by assigning a portion of her territory each Saturday to other DSRs.

18  The evidence at trial established that none of these accommodations were feasible,

19  either.  Early weekday mornings when people are asleep or off to work or school

20  were no substitute for Saturdays (the best sales day of the week, per Swift); Charter

21  did not employ part-time DSRs or have a commission plan or territorial assignment

22  and rotation system in place to accommodate part-time DSRs; and Charter did not

23  want DSRs selling in each other's territories for good reasons, as detailed herein.

24    Based on these claims, Dykzeul asks the Court to award her damages,

25  including $425,530.72 (assuming she made $100,000 per year, plus benefits) or

26  $258,062.29 (assuming she made $75,000 per year, plus benefits) for four years of

27  allegedly lost earnings, $500,000 in emotional distress damages, and punitive

28  damages.  Dykzeul's damages calculations have no basis in reality, and are based

entirely on language about a DSR's earnings "potential" "*[i]f sales targets are met*" and Dykzeul's belief, without foundation, that selling Charter's products was easy and that she would have been a superstar performer there until she retired.  The truth is, of the 29 DSRs who worked in the Turlock territory between October 2015 and October 2018, only *one* made an average of $75,000 or higher per year.  Only *one* DSR reporting to Swift regularly made her or his targets.  And of those 29 DSRs, 73.3% lasted less than nine months on the job.

The DSR position was not an easy job.  It was a door-to-door sales job that required each DSR to cover a territory of 400 to 500 assigned addresses each month.  To make as many contacts as possible, which would hopefully lead to conversations and ultimately sales, DSRs were required to knock on at least 50 doors per day and be available to work weekdays (particularly the "hot time" of 3:00 or 4:00 in the afternoon until 8:00 or 9:00 in the evening) and Saturdays.  The job required the DSR to understand Charter's products, their pricing, and competitor offerings.  It also involved a lot of walking, a lot of perseverance, and a lot of rejection.  Most people did not stay in the job long.

Dykzeul's beliefs about how long she would have worked as a Charter DSR and how successful she would have been are also discredited by her actual performance at one of her subsequent employers, Patient Care America ("Patient Care"), and her attempts to conceal this fact from Charter and the Court in this proceeding.  Patient Care terminated Dykzeul's employment for poor performance and lack of sales; Trial Exhibits 27 and 55 document Dykzeul's deficiencies, confirmed by the testimony of Indira Seoane, Patient Care's human resources director at the time.  Yet, this was almost not known in this case.  Contrary to Dykzeul's actual performance at Patient Care, Dykzeul testified in this case that things went "well" at Patient Care and that she had received a "great 90-day evaluation in February 2018."  Dkt. 142 at 7:26-28.  She claimed she did not know why she had been let go from Patient Care, and attempted to blame it on retaliation

for taking medical leave.  *Id*. at 8:6-9.  Worse, she also redacted the records produced by Patient Care in response to a subpoena to hide the real reason she was terminated at Patient Care.  At trial, the unredacted records were produced and admitted into evidence, Seoane testified, and it was established that Dykzeul was an extreme underperformer at Patient Care who struggled to make sales, was disorganized, and ultimately was terminated for poor performance.

When a witness deliberately testifies untruthfully, that witness's credibility is cast into such doubt that, in a jury trial, jurors are even instructed they can choose not to believe a word the witness has said.  MCJI 1.14.  Here, Dykzeul has tried to inflate her damages and create the false impression that she was a superstar performer everywhere she worked.  In fact, she was a serial job-hopper who worked at eight different employers between October 2018 and 2019 and who was terminated from at least one of them for poor performance.  Dykzeul's willingness to flout the truth when presenting her claims and assertions in this case should color everything she has claimed in this case, not just about damages, and especially when her testimony regarding other matters conflicts with that of other witnesses.

At the end of the day, Dykzeul's claims should each be rejected.  She has not proven her claims and, in the case of her failure to accommodate claim, Charter has established that Dykzeul's proposed accommodations would have imposed an undue hardship (*i.e.*, more than a de minimis burden) on Charter and its employees. Dykzeul's damages claims should also be rejected as grossly inflated, and of course no punitive damages should be awarded because there was no evidence at trial that would warrant their imposition.  Accordingly, this Court should enter judgment in favor of Charter on all of Dykzeul's claims.

## II.   **THE TRIAL**

A three-day bench trial was conducted in this matter from July 20-22, 2021. The Court heard live testimony from Dykzeul, former Charter Direct Sales Supervisor Jim Swift, former DSRs Krystyna Amaral and Daniel Blond, Dykzeul's

1  damages expert Wesley Nutten, and Charter's damages expert Amy Aukstikalnis.

2  The parties also submitted into evidence the deposition testimony of former Charter

3  in-house recruiter Tamara Prunty, former DSR Neila Deneen, and direct testimony

4  declarations from Dykzeul, Nutten and Aukstikalnis.  The Court also admitted trial

5  exhibits from the parties' joint exhibit list into evidence.

6  **III.   STATEMENT OF FACTS**

7        **A.   Dykzeul Applied At Charter To Work As A DSR, A Challenging
8             Job That Experienced Frequent Turnover**

9        This case concerns Dykzeul's application for a DSR position at defendant

10  Charter in October 2015.  Stipulated Fact No. 1 from the Parties' Joint Stipulation

11  of Facts Deemed Admitted for Trial, Dkt. 137 ("SF No. _").  One of Dykzeul's key

12  contentions in this case has been that her success at Charter was virtually

13  guaranteed, including that sales were easy to achieve and that she would have

14  worked there until she retired.  Dkt. 142 at 9:25-10:2.  In fact, although some

15  people have been successful as DSRs, most people have found it challenging, and

16  turnover in the position is high.

17        DSRs are exempt sales employees that go door-to-door selling cable,

18  internet, and telephone services.  SF No. 2.  At the time of Dykzeul's application in

19  October 2015, DSRs reporting to Swift were given approximately 400 leads per

20  month.  7/21/21 Trial Tr. at 211:17-25.  Charter had a systematic way it wanted to

21  work the territory, to ensure that DSRs did not just go "wherever they wanted." *Id.*

22  Overall, each territory had a six-month rotation, where Charter tried to cover the

23  entire territory during the six-month period before starting the rotation over.  *Id.* at

24  212:4-16.  The purpose of the strategy was to ensure that DSRs did not simply go

25  back to the same addresses and contact the same people over and over.  *Id.* at

26  213:1-13.  Overworking the same territory too frequently irritated potential

27  customers and was not productive.  *Id.*

28  / / /

1     The DSR job is physically hard and involves walking "a lot of mileage,"

2  according to former Charter DSR Daniel Blond, who testified at trial.  7/20/21 Trial

3  Tr. at 78:2-12.  Blond testified that he would have to get new shoes every so often

4  due to all the walking, and that he "lost a lot of weight" from the "workout" he got

5  each day.  *Id.*  Another former DSR, Krystyna Amaral, testified that the "most

6  difficult part of the job was the people I would deal with."  *Id*. at 100:3-6.  "If they

7  slammed the door on my face or didn't want to talk to me, it was, a personal thing

8  for me."  *Id.*

9     Swift found that it was not easy to make sales as a DSR.  7/21/21 Trial Tr. at

10  239:3-4.  While working at Charter, Swift once analyzed the percentage of Charter

11  DSRs nationwide who were hitting their targets and determined that roughly only

12  8-10% of all DSRs successfully hit their targets.  *Id*. at 219:20-220:12.  This was

13  consistent with what Swift observed for the DSRs who reported to him.  *Id.*  At the

14  time, in addition to Turlock, Swift supervised the Gilroy and San Luis Obispo

15  territories.  Stipulated Fact No. 6.

16     Swift also refuted Dykzeul's contention that "selling Internet, cable and

17  phone service did not require much explanation about the product and only about

18  the different options and pricing."  7/21/21 Trial Tr. at 238:22-239:2.  For example,

19  on a typical day, Swift would receive up to 5 to 10 calls from DSRs in the field

20  needing assistance, whether it was an upset customer, an installer that was missed, a

21  pricing issue, a question about the product, or a question about competitors.  *Id*. at

22  205:22-206:10.  DSRs also faced unique hurdles in the Turlock territory.

23  Specifically, the Turlock territory had a worse reputation than the other areas Swift

24  supervised, because Charter had a bad reputation there for reliability of service.

25  7/20/21 Trial Tr. at 189:4-12.

26     Swift did not have any DSRs that worked for him until retirement.  7/21/21

27  Trial Tr. at 238:1-13.  To the contrary, most DSRs ultimately left the job due to a

28  lack of production and the frequent rejection they faced when trying to make sales.

1    *Id*. at 238:14-21.  As Swift explained:

2           Ultimately, they're not making enough money to stay. But
3           couple that with the rejection that we receive every day
       which is probably about 98 percent of the people we speak
       with, it's a difficult job. It's tough to take that every day of
4           your life and deal with it.

5    *Id*.

6           Aukstikalnis testified that **73.3%** of the Charter DSRs who worked in

7    Turlock between October 2015 and October 2018 worked as a DSR for *less than*

8    nine months.  7/21/21 Trial Tr. at 364:11-15; 370:14-25; Dkt. 143, Aukstikalnis

9    Trial Decl. at 4:4-5.

10          **B.**     **Dykzeul Applied For The DSR Job At Charter Knowing It**
                  **Required Friday Evening And Weekend Work, Representing That**
11                **She Was Available Those Times**

12          Before Dykzeul interviewed for a DSR position with Charter, she filled out

13   an application.  Trial Exhibit ("TE") 1.  The job application and DSR job

14   description both explicitly stated that the ability to work weekends and evenings

15   was a requirement.  TE 1, p. 11; TE 29, p. 2.  Specifically, **"Must be available**

16   **weekends and evenings"** was listed as a "Qualification" for the position in the job

17   description:

18          Qualifications
             •1 year sales and customer service experience is a plus
19          •Must enjoy working with the general public
             •Must be enthusiastic, outgoing, and customer service oriented
20          •Must have excellent communication and interpersonal skills
21          •Must be available weekends and evenings
22          •Must be at least 18 years of age
             •Must pass background/drug screen
23

24   TE 29, p. 2.

25          Dykzeul submitted her application for a DSR position in Turlock, California

26   on October 5, 2015.  Dkt. 142, 3:17.  As Dykzeul has stipulated, "[t]he application

27   asked if Dykzeul was able to work evenings and weekends, to which Dykzeul

28   answered that she could."  SF No. 3.  This is confirmed in Dykzeul's job

application:

| 4. Are you able to work evenings and weekends?<br>Type: Single Answer | X Yes |
| --- | --- |
| | No |
| | Result for question: |

TE 1, p. 11.

After Dykzeul applied for the DSR position, Tamara Prunty, a Charter recruiter, pre-screened Dykzeul by telephone.  SF No. 4.  Prunty's testimony was presented at trial by way of deposition designations.  Dkts. 148 and 149.  Prunty's job was to review applications and resumes candidates submitted through Charter's applicant tracking system or on job boards.  Dkt. 148, Prunty Depo. at 18:10-19:4.  It was Prunty's responsibility to determine which candidates to schedule for an interview based on their answers to questions in the application and their experience and work history; she looked to ensure that they met the minimum requirements of the position.  *Id.* at 19:12-23, 20:16-21:6.

During her prescreening calls, Prunty would review with each candidate the hours that DSRs were required to be available.  Dkt. 148, Prunty Depo. at 24:2-25, 25:15-26:17, 26:24-27:11.  Prunty stated what the job requirements were, and then asked candidates if they were able to fulfill all of the requirements.  *Id.* at 32:21-33:14.  Regarding work hours, Prunty told candidates during the prescreen calls that DSRs "work evenings and Saturday."  *Id.* at 33:15-35:1.  Although Prunty did not specifically recall her prescreening call with Dykzeul, she testified that she conducted every prescreen "exactly the same" and that the calls always covered "the same questions."  *Id.* at 35:5-18, 36:22-37:5.  Prunty only moved a candidate to the next step of the application process, an interview with the sales supervisor, if she was satisfied that the applicant met the required qualifications and was able to meet the job's requirements, including the ability to work weekday evenings and Saturdays.  *Id.* at 19:12-21:6, 24:2-26:27:11, 33:15-35:1.

/ / /

C.    **The _Only_ Reason Swift Did Not Hire Dykzeul Was Because She Could Not Work On Saturdays**

On October 15, 2015, Swift interviewed Dykzeul for the DSR position.  SF No. 5.  Swift told Dykzeul during the interview that the availability to work Saturdays was a requirement for the DSR position.  SF No. 7.  The parties agree and have stipulated that, during the interview, Dykzeul told Swift she could not work Friday nights and Saturday afternoons due to her observance of the Sabbath.  SF No. 10.

The parties disagree about whether Dykzeul said she could work Saturday nights after sundown.  Dykzeul claims now that she offered to work Saturday nights during her interview with Swift.  Dkt. 142, p. 5.  But, in Dykzeul's personal notes from her interview with Swift and her December 27, 2017 EEOC discrimination charge submitted under penalty of perjury, she wrote that she had told Swift about her "inability to work Saturdays," without any reference to an offer to work Saturday nights instead.  7/21/21 Trial Tr. at 307:3-310:24; TE 18, pp. 4-5.  Swift also denied in his testimony that Dykzeul offered to work Saturday nights.  7/21/21 Trial Tr. at 224:1-2.  Swift testified that Dykzeul told him she would have to stop work on Friday evenings to be somewhere by 7:00 pm, and that she could not work on Saturdays.  _Id_. at 223:18-25.

Swift understood from Dykzeul that her unavailability to work Fridays after 7:00 and Saturdays was due to a religious issue, but he did not know or ask anything further about her religion.  7/21/21 Trial Tr. at 233:3-234:2; _see also_ SF No. 11.  He did not know or ask what her faith was, what church she belonged to, or whether she was in a synagogue.  _Id._  Indeed, he had no ill will or prejudice at all against Dykzeul because of her religious background.  _Id._

Dykzeul has stipulated that Swift thought Dykzeul had potential as a DSR and wanted to hire her.  SF No. 13.  Swift had no problem with Dykzeul having to stop work early on Fridays, because he understood she would only miss about an

hour and a half of that time.  7/21/21 Trial Tr. at 224:5-14.  However, if Dykzeul had told Swift that she could not work past sundown on Fridays (which is what she now claims to have told him), that would have posed a larger problem because, during the winter, that would take out most of the prime Friday evening sales hours. *Id*. at 224:14-225:6.  Regardless, Swift's concern at the time was with Dykzeul's inability to work Saturdays. *Id.*

Swift's concern about Saturdays was that, in his experience, Saturdays were the most productive day of the week.  7/21/21 Trial Tr. at 225:9-15.  In Swift's experience working as a DSR before Charter and then as a DSR Supervisor at Charter, the most successful times for selling cable, Internet and phone service were 4:00 to 9:00 pm on weekdays and on Saturdays, because that was when more decision-makers were at home from work. *Id*. at 201:12-23.  Within the 400 addresses assigned each month to each DSR, Swift found there was a mix of people who would be home during the weekdays, the weekday evenings and weekends. *Id*. at 212:14-214:19.  Working on Saturdays allowed DSRs to make contact with customers that might not be available on the weekdays and to reach customers when all the decision-makers were home. *Id*. at 215:2-18.  Thus, Swift was concerned that if Dykzeul could not ever work on Saturdays, there would be some customers that would simply never be reached and thus sales that could never be achieved. *Id*. at 225:9-15.

Other witnesses also testified about the importance of Saturdays.  Amaral found Saturdays provided her an opportunity to "get in front of those doors that weren't home during the week."  7/20/21 Trial Tr. at 102:20-103:3.  Blond testified that, unless he worked Saturdays, he was unable to hit about 75 of his assigned leads each month. *Id*. at 80:17-81:2.  In Blond's experience, on Saturdays, there were "definitely a lot more contacts of people at home." *Id*. at 59:10-16.  Blond also testified that he was able to make sales "[j]ust about every Saturday" he worked. *Id*. at 68:7-8.

Swift contemplated what to do over the weekend after the interview.  7/21/21 Trial Tr. at 225:16-227:12.  Swift testified that he thought about alternatives, including letting Dykzeul try to make up the time on weekday mornings or Sundays.  *Id.*  With respect to weekday mornings, Swift dismissed the idea "quickly … because morning hours on the weekdays just are not that productive." *Id.* Swift's conclusion that weekday mornings were not an adequate substitute was backed up by Blond, who testified that working early on the weekdays was unproductive.  7/20/21 Trial Tr. at 72:3-15.  As Blond put it, "you're basically walking around half-empty neighborhoods" because "the majority of everybody is, you know, working during the day." *Id.*

Swift also considered allowing Dykzeul to work Sundays instead, which is what he understood she had proposed in the interview.  7/21/21 Trial Tr. at 225:16-227:12.  As he explained:

> And I felt, you know, I've got to hire someone to set them up to be successful. It's got to be good for them.  It's got to be good for the company. Otherwise, they're just going to transition out.  So then I really gave it a long hard thought about, okay, she volunteered to work on Sundays. Can I make that work? And I gave it a lot of consideration.

*Id.*

Swift's primary problem with allowing Dykzeul to work on Sundays was that it meant he would have to be on call on Sundays as well.  *Id.*  And as he explained, he was already working six days per week and he did not want to have to work all seven days (every week) as would be required for Dykzeul to work Sundays.  *Id.* Swift was willing to work Sundays occasionally to try to let a DSR catch up on his or her quota, but he did not want to have to work every Sunday.  *Id*. at 235:15-236:8.

Swift also knew that Sunday hours were unproductive, based on his own sales experience.  7/21/21 Trial Tr. at 225:16-227:12; *see also Id*. at 211:5-6.  It was extremely rare for a DSR who reported to Swift to work Sundays.  *Id*. at 211:7-8.

Thus, Swift concluded that allowing Dykzeul to work Sundays instead of Saturdays would not work:

> I just felt, you know, this job is tough enough.  You've worked 30 years working six days a week. I don't know that I can do seven days a week for any length of time.  So either she'll transition out or I will. And that really was kind of the bottom line is if she works Sundays, I've got to be on call.
>
> What happened. She's in Turlock. At the time I was living in either Gilroy or Hollister; and if something happened to her and things happen in the field, but you're going to have to go there.
>
> You can't wait to the very last second on Monday to investigate an accident, a customer that gets upset at you at the door and does something that they shouldn't which happens.
>
> But I did think about it quite a bit over the weekend. I remember that that's why I remember this whole – that's why I remember her.
>
> And I just -- I came to the conclusion that I just didn't think it would work plus it did, you know, I thought back to my Sundays that I used to work. When I first got in the business, I worked a lot of Sundays. I just didn't produce much on Sundays.  People go to church. People don't want to be bothered by door-to-door salespeople for the most part but especially on Sundays.  So I found -- I eventually just said -- I stopped working Sundays, period, because of it. It just didn't produce enough income to be away from my family every Sunday. So that's it.

*Id.*

Other DSRs also testified that Sundays were unproductive sales days for DSRs at Charter.  Blond testified that he tried working Sundays, and although he had more customer contacts, he never made a single sale on a Sunday.  7/20/21 Trial Tr. at 67:20-68:6.  Amaral tried working three or four times on Sundays, but found that "there was a lot of people out for church and things like that." *Id*. at 103:17-21.

In the end, Swift made his decision not to hire Dykzeul by Sunday evening or Monday morning.  7/21/21 Tr. at 234:3-4.  He attempted to call her to tell her of his decision, but did not reach her.  7/21/21 Tr. at 234:5-14.  Swift had concluded that

1   Dykzeul could not work Sundays instead of Saturdays because it would require him

2   to work seven days a week.  Stipulated Fact No. 14.  Charter did not hire Dykzeul

3   for the DSR position, and Swift was the only one who made the decision not to hire

4   Dykzeul.  Stipulated Fact Nos. 15 & 16.  The only reason Swift did not hire

5   Dykzeul was because she could not work on Saturdays.  Stipulated Fact No. 17.

6       **D.    DSRs Who Reported To Swift As Of October 2015 Were Required**

7       **To Work On Saturdays**

8       Dykzeul contends in this proceeding that DSRs were not required work on

9   Saturdays when she applied for the DSR position in October 2015, and that

10  Charter's claim that DSRs were required to work Saturdays is an elaborate lie.

11  Dykzeul relies on the fact that DSRs did not record vacation or sick days and were

12  not subject to discipline if they missed a Saturday, and testimony from former

13  DSRs, who worked during a different time period and under different policies, that

14  some DSRs were occasionally permitted to miss work on a Saturday, to support her

15  contention that DSRs did not need to work on Saturdays.  But the fact that some

16  DSRs were occasionally allowed to miss a Saturday, or that employees were not

17  formally disciplined for missing a Saturday, does not mean that DSRs were not

18  required to work Saturdays.

19      As Swift explained in his testimony, in October 2015, working Saturdays

20  was a requirement for all DSRs who reported to Swift.  7/20/21 Trial Tr. at 150:15-

21  22; 7/21/21 Trial Tr. at 215:20-23.  DSRs were required to be available to work on

22  Saturdays because, in Swift's experience, Saturday was the best production day of

23  the week.  *Id.* at  215:24-216:2.  Swift learned of the Saturday work requirement

24  from Bob Reese, Swift's sales manager when Swift started at Charter in 2012.  *Id.*

25  at 218:7-24.

26      Dykzeul was advised of the policy during her job application process.  As

27  noted previously, both the DSR job application and job description explicitly stated

28  that the ability to work weekends and evenings was a requirement.  TE 1, p. 11; TE

29, p. 2.  And, as Dykzeul has stipulated, DSRs were not required or expected to work on Sundays, and Sundays were not considered regular workdays or part of the regular work schedule for DSRs (SF No. 9), leaving Saturday as the only other weekend day.

Saturday hours started at 9:00 or 9:30 am in October 2015, and the end-of-day call was at either 2:00 or 3:00 pm.  7/21/21 Trial Tr. at 200:17-24.  That did not mean a DSR could not sometimes take a Saturday off.  In October 2015, Swift also had a system in place where a DSRs could be excused from working a Saturday *if* they had met their previous month's sales target *and* were on pace to meet the current month's target.  *Id*. at 216:3-13.  Thus, if a DSR wanted to take a Saturday off, the DSR did not have to take a vacation day, but Swift would look to see how the DSR was doing towards hitting her or his quota before deciding whether to let the DSR have that Saturday off.  7/20/21 Tr. at 160:21-161:12.

The work requirements later changed, so that anyone who had met the prior month's target and was on target for the current month could stop work early on a given day once they achieved two sales.  7/21/21 Tr. at 218:25-219:12.  This applied to Saturdays as well as weekdays.  *Id*.  Then, around May 2019, the policy changed again to allow DSRs to take up to two Saturdays off per month.  *Id*. at 243:3-244:1.  But very few DSRs, if any, took off any given Saturday.  *Id*. at 217:4-10.

This was corroborated by other witnesses.  Both Blond and Amaral testified that they were told in their job interviews that Saturday work was required.  7/20/21 Trial Tr. at 45:10-16; 91:23-92:7.  Blond worked at Charter from February 2018 to September 2018 (*i.e.*, for about 9 months, three years after Dykzeul's interview).  *Id*. at 70:14-71:3.  Blond admitted he had no idea what the weekly scheduling requirements were at Charter for DSRs before the time he worked there.  *Id*. at 71:4-8.  While Blond worked at Charter, it was stressed to him that DSRs worked six days a week.  *Id*. at 75:4-12.  Blond agreed that not working on a Saturday was

"discouraged, greatly discouraged." *Id*. at 64:13-23.

Amaral started working for Charter around November 21 or 22, 2017, *i.e.*, two years after Dykzeul interviewed at Charter. 7/20/21 Trial Tr. at 89:19-21. Amaral also had no knowledge about whether Saturdays were required for DSRs in October 2015. *Id*. at 114:13-15. Amaral testified that Saturday hours ran from "8:00 to 11:00 or 9:00 to 2:00 roughly" while she worked as a DSR, and the Saturday hours would change sometimes. *Id*. at 106:15-18. Amaral claimed she learned eventually that working Saturdays was not strictly "required," but that it was "encouraged" and that failure to do so was "frowned upon." *Id*. at 101:24-102:19. Amaral did miss a few Saturdays, but only a "handful"; the majority of the time, she did work Saturdays. *Id*. at 102:20-103:3.

Denneen admitted that she had difficulty recalling matters from her time as a DSR between 2013 to 2016, because she had "a major surgery" and "a lot going on" during that time and "so a lot of things are kind of a blur" to her. Dkt. 153, Denneen Depo. at 106:3-13. And she admitted that "there could have been changes in company policy and [she] wouldn't have remembered it." *Id*. Although Denneen claimed that when she was hired as a DSR in 2013 (*i.e.*, two years before Dykzeul's interview) she had been told that Saturdays were optional, she did not interview with Swift but rather with a different supervisor. *Id*. at 10:2-11:13, 16:6-15. Denneen admitted that when Swift became her supervisor, he would "push [them] and be like, you know, you got to work Saturdays." *Id*. at 11:3-13.

### E.   Other Accommodations Proposed By Dykzeul In This Proceeding Also Would Have Imposed An Undue Hardship

Dykzeul has proposed other, theoretical accommodations in this proceeding that she contends could have been implemented to allow her to work as a DSR at Charter. For example, she has suggested Charter could have (1) hired another employee to cover her Saturday shifts, (2) allowed other DSRs to sell in her territory on Saturdays, or (3) allowed Dykzeul to have worked a reduced schedule.

1          Although Swift never considered it at the time, he explained that hiring a

2   part-time employee to cover Dykzeul's Saturday shifts would not have been a

3   feasible solution because of the expense of hiring, training and ramping up another

4   employee, the need to revamp the entire commissions structure, and the difficulties

5   associated with having a part-time employee who would not have the benefit of

6   participating in the weekday group DSR calls, during which significant on-the-job

7   training takes place.  7/21/21 Trial Tr. at 227:16-229:14.  More importantly, Charter

8   did not have any part-time DSR positions and did not hire people part-time for the

9   job.  7/21/21 Tr. at 231:16-232:20.  In effect, Charter would have to create an

10  entirely new position (part-time, one-day-a-week DSR), find and hire someone who

11  would be good at the position, and figure out how to manage and incentivize the

12  position.  In other words, more than a de minimis burden.

13         Swift also did not consider having another DSR cover Dykzeul's territory for

14  her on Saturdays because the other DSRs already had their own territories to cover

15  and doing so would undermine Charter's entire territory assignment and rotation

16  system.  7/21/21 Tr. at 229:15-230:4.  Such a reassignment would also decrease

17  Dykzeul's compensation by reducing the number of commissions she could earn,

18  given that another DSR would also be selling to her assigned territory.  *Id.*  Such a

19  change would also encourage DSRs to sell in other DSRs' territories, pitting DSRs

20  against each other and undermining the entire system that Charter employed.  *Id*. at

21  230:5-231:12.  Finally, the evidence at trial showed that, under the current

22  schedule, DSRs were just able to cover their monthly territory.  *See, e.g.*, 7/20/21

23  Trial Tr. at at 80:17-81:2 (Blond needed to work Saturdays just to cover his existing

24  territory).  Adding more addresses to someone's territory for one day each week

25  would not be feasible and would impose more than a de minimis burden on those

26  other employees and on Charter.

27  / / /

28  / / /

F.      **Dykzeul's Subsequent Employment History Shows That She Was Unlikely To Work At Charter Long, Even If She Had Been Hired As A DSR**

After Dykzeul interviewed for the Charter DSR position on October 15, 2015, she obtained subsequent employment as follows:

- In the same month, October 2015, she accepted a part-time job with AppStar Financial "selling leases for payment processing machines to businesses." Dkt. 142, ¶ 19.

- In March 2016, she quit AppStar and started working for Heartland Payment Systems full time as an outside salesperson, also selling payment processing machines to businesses. Dkt. 142, ¶ 21.

- In August 2016, she quit Heartland, a full-time position, to take a part-time position with Life Alert as an inside salesperson selling emergency life-saving response buttons to seniors. Dkt. 142, ¶ 22. In the approximate 13 months that Dykzeul worked for Life Alert, she made approximately $70,000 in commissions on part-time hours (about $64,000 a year). *Id.*

- In October 2017, she quit Life Alert and accepted a full-time sales position with Patient Care America selling dialysis products to patients. Dkt. 142, ¶ 23. Patient Care paid her a $70,000 annual base salary plus commission and benefits. *Id.*

- In April 2018, Patient Care America terminated her employment. Dkt. 142, ¶ 23.

- Dykzeul thereafter decided to start selling insurance, and she took the California Life and Health insurance exam in July 2018. Dkt. 142, ¶ 24. On August 31, 2018, she became a licensed insurance agent to sell life and health in insurance in California. *Id.*

- In October 2018, she went to work with Millennia Tax Relief. Dkt. 142, ¶ 25.

/ / /

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

17

- In December 2018, she left Milennia Tax Relief and started working with two other companies, Aflac and Mass Mutual.  Dkt. 142, ¶ 26.
- Finally, in February 2019, she accepted a full-time sales position with a company called Goldco selling gold and silver.  Dkt. 142, ¶ 27.

This record alone shows that Dykzeul was a serial job-hopper who never stayed in one job for long and was always looking for the next opportunity.  Nor was her job-hopping limited to the period after Dykzeul interviewed at Charter; her prior employment history shows more of the same.  Aukstikalnis analyzed Dykzeul's complete employment history, and determined that:

- For jobs held by Dykzeul since 1996, her average length of employment was 1.21 years.
- For jobs held since 2011, her average length of employment was 0.71 years (8.6 months).
- From October 2015 to the time of trial, she held eight different jobs, with an average job length of 0.67 years (8 months).

Dkt. 143 at 9:2-8.

Dykzeul may have felt she had good reason to keep changing jobs, but her frequent job changes suggest her experience at Charter also would have been short-lived, particularly if she came into the job expecting it to be easy and that she was going to make $100,000-plus a year, as she has claimed in this proceeding.  Based on other new DSR's real-world experiences and Dykzeul's own employment history, the most likely scenario is that Dykzeul would have quickly been disappointed working at Charter and moved on to another job, just like she has done everywhere else.  Based on this evidence alone, there is no reason to believe that Dykzeul would have worked for Charter in Turlock—a known difficult territory and in a job with high a turnover rate and where 73% of employees lasted less than 9 months—for **_four years_**, let alone until retirement, as Dykzeul claims in this lawsuit.

However, the evidence got worse for Dykzeul at trial, particularly with respect to one of her subsequent employers, Patient Care.  At trial, Dykzeul testified that, in April 2018, she voluntarily left a successful position at Life Alert to pursue what she believed was a better opportunity at Patient Care.  7/21/21 Trial Tr. at 317:2-7.  Patient Care provided a base annual salary of $70,000 plus commissions and full benefits.  *Id*. at 317:8-14; Dkt. 142, ¶ 23.

Dykzeul's tenure at PCA began with a 90-day probationary period.  7/21/21 Trial Tr. at 317:15-19.  Contrary to her claims of having been a star employee everywhere she went, her probationary period at PCA was extended by an additional thirty days.  *Id*. at 317:20-22.  Although Dykzeul professed at trial not to recall why Patient Care extended her probationary period, in truth it was extended because Patient care determined she required extra training.  7/21/21 Tr. at 317:20-318:6; Dkt. 158, 7/22/21 Trial Tr. at 10:13-18, 27:17-21.

Dykzeul also tried to avoid answering questions about various training and counseling she received at Patient Care, ultimately testifying that she could not remember whether she had received counseling at Patient Care about lack of product knowledge or having trouble remembering names.  7/21/21 Tr. at 318:15-319:15.  Although Dykzeul admitted that she was let go from Patient Care, she denied at trial that it was for performance reasons and claimed she was "[a]bsolutely" certain that she was never given a reason for her termination despite asking for one:

> Q.  Didn't she [Indira Seonne, Patient Care's HR director] tell you that you were being let go for performance problems?
>
> A.  No.
>
> Q.  And you're certain of that?
>
> A.  Absolutely. I asked. I never got an answer.

7/21/21 Trial Tr. at 319:25-320:18.

/ / /

1    Dykzeul also denied having any problems meeting her sales targets at Patient

2 Care.  7/21/21 Tr. at 320:19-321:11.

3    Patient Care's then-HR Director, Indira Seoane, testified at trial, exposing

4 Dykzeul's false claims about her time at Patient Care.  Seoane testified that she was

5 the one who informed Dykzeul of her termination, and that Seoane specifically

6 informed Dykzeul that she was being terminated for poor performance:

7    Q:    Do you recall – well, were you involved in the decision to
           terminate Ms. Dykzeul's employment?
8

9    A:    Yes.

     Q:    Do you recall the reason why her employment was
10          terminated? Why was it terminated?

11   A:    Due to performance.

12   . . .

13   Q:    Did you – were you involved in the process of informing
           Ms. Dykzeul about her termination at all?
14

15   A:    Yes.

     Q:    How so?
16

17   A:    I was the one that did her termination.

     Q:    And how was the information conveyed to Ms. Dykzeul?
18

19   A:    It was via a conference call because we are all in different
           states. . . . And I informed Teresa that her employment
20         **was being terminated as of April 30th, 2018, due to
           performance.**

21   . . .

22   Q:    Okay. And now did you specifically inform her the reason
           during that call why her employment was being
23         terminated?

24   A:    Yes.

25   Q:    And that it was being terminated for performance
           reasons?
26

27   A:    That's correct.

28 Dkt. 158, 7/22/21 Trial Tr. at 7:8-13, 19:23-20:21.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

Seoane was asked what about Dykzeul's performance led to her termination, and she explained that Dykzeul's supervisor, who had just spent some time shadowing Dykzeul visiting clinics, reported that Dykzeul was not prepared for meetings, made inappropriate comments, and did not have product knowledge. Dkt. 158, 7/22/21 Trial Tr. at 11:14-15:25.  Trial Exhibit 55, an email thread between Dykzeul's then-supervisor and Seoane documented the numerous problems Dykzeul's supervisor experienced with Dykzeul's performance.  Dkt. 165, TE 55, pp. 11-14.  Notably, the Court admitted an unredacted version of Trial Exhibit 55 over Dykzeul's objections.  *See* Dkts. 164 and 166.  Previously, Dykzeul had attempted to hide these documents from the Court and Charter by redacting them.  *See* Dkt. 164 ("Numerous exhibits in the Court's exhibit binder consist of totally redacted pages.").

In the email that was admitted as Trial Exhibit 55, Dykzeul's supervisor summarized her experience with Dykzeul:

> This was our last visit of the day at which point we returned to the car where I expressed my concerns with Teresa's lack of planning, preparation and clinical knowledge. Teresa replied that she was not surprised about her vast weaknesses and that she was excited to be able to "learn from me".

> In summary, I'm gravely concerned about Teresa's ability to be successful in her role which I believe is negatively impacting our business in Southern California. Based on my observations, Teresa is not perceived as a competent and trusted resource but rather as someone who is 'confusing and difficult' and in my opinion, clinically incompetent.

At trial, Seoane also explained that the 90-day performance evaluation Dykzeul misleadingly described as "great" in her trial declaration actually showed that Dykzeul's performance up to that point was underwhelming.  Dkt. 158, 7/22/21 Trial Tr. at 7:14-10:25, 24:11-21, 27:17-21, 40:3-23; TE 27.  Dykzeul had zero "starts" while her 90-day goal was *four*, and she only had 17 "referrals" while Seoane estimated that the average representative brought in *over 50* a week.  *Id.*  As

Seoane put it, Dykzeul's 17 referrals was "a very low number" indicative of "poor performance." *Id.*  In short, Dykzeul's job history after her interview with Charter completely undermines her contention that she would have been a long-term, superstar performer at Charter if she had only gotten the DSR job.

## IV.   LIABILITY

### A.   Legal Framework

Dykzeul asserts both intentional and failure to accommodate religious discrimination claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and the California Fair Employment and Housing Act (the "FEHA").  Although there are slight differences in nomenclature, Title VII and the FEHA prohibit the same things.

An employer violates both statutes if it makes an adverse employment decision "because of" an employee or applicant's religion, religious beliefs, or religious practice.  42 U.S.C. § 2000e–2(a); Cal. Gov't Code § 12940(a).  A violation of both statutes also occurs if an employer fails to reasonably accommodate a religious practice or observance that it could have without undue hardship.  42 U.S.C. § 2000e(j); Cal. Gov't Code § 12940(l).

The analyses of Dykzeul's Title VII and FEHA claims are the same.  *See, e.g.*, *Cook v. Lindsay Olive Growers*, 911 F.2d 233, 241 (9th Cir. 1990) (applying Title VII precedent to plaintiff's state law FEHA claim in a religious accommodation case); *Madsen v. Associated Chino Tchrs.*, 317 F. Supp. 2d 1175, 1180 (C.D. Cal. 2004) ("Where a plaintiff alleges discrimination based on religion, a court may rely on federal Title VII law alone.").[1]

---

[1] As the Court recognized in its summary judgment order:

> The analysis of a religious discrimination claim is the same under FEHA and Title VII.  California courts have observed that "[a]lthough the wording of [T]itle VII differs in some particulars from the wording of FEHA, the antidiscriminatory objectives and overriding public policy purposes of the two acts are identical."  Therefore, "California courts apply the Title VII

**B.** **Charter Could Not Accommodate Dykzeul's Inability To Work
All Saturdays Without Undue Hardship**

Dykzeul insists that Charter needed to excuse her from having to work Friday
evenings and Saturdays entirely, reduce her sales targets and performance
expectations, and allow her to work a reduced work schedule of Monday through
sundown Friday to satisfy its duty to accommodate.  Alternatively, she contends
that Charter could have accommodated her by either letting her make up her Friday
evening and Saturday hours on Sundays or letting her work longer hours on the
weekdays.

Under both Title VII and the FEHA, a claim for failure to accommodate
religious beliefs fails if an employer "show[s] *either* that it initiated good faith
efforts to accommodate reasonably the employee's religious practices *or* that it
could not reasonably accommodate the employee without undue hardship." *Tiano
v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 681 (9th Cir. 1998) (emphasis added);
*California Fair Employment & Housing Com. v. Gemini Aluminum Corp.*, 122
Cal.App.4th 1004, 1011 (FEHA) ("Once the employee establishes a prima facie
case with sufficient evidence of the three elements, the burden shifts to the
employer to establish that 'it initiated good faith efforts to accommodate *or* no
accommodation was possible without producing undue hardship' ") (emphasis
added).[2]

Undue hardship is determined "on a case-by-case basis." *Berry v. Dep't of
Soc. Servs.*, 447 F.3d 642, 655 (9th Cir. 2006).  "[A]n accommodation causes
'undue hardship' whenever that accommodation results in 'more than a *de minimis*

framework to claims brought under FEHA." The Court
therefore analyzes Plaintiff's discrimination claims under Title
VII and FEHA together.
(citations omitted).

[2] Dykzeul incorrectly suggests in her brief that an employer must prove that it made
*both* a good faith effort to accommodate *and* that any proposed accommodation
would cause undue hardship.

cost' to the employer." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 67, 107 S. Ct. 367, 371, 93 L. Ed. 2d 305 (1986) (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84, 97 S. Ct. 2264, 2269, 53 L. Ed. 2d 113 (1977).[3]   Courts have observed that undue hardship "is not a difficult threshold to pass." *Webb v. City of Philadelphia*, 562 F.3d 256, 260 (3d Cir. 2009).

The Ninth Circuit has held that undue hardship can come in the form of "higher wages" or "additional costs in the form of lost efficiency." *Opuku-Boateng v. State of Cal.*, 95 F.3d 1461, 1468 (9th Cir. 1996) (internal citations omitted). Thus, "[t]he cost of hiring an additional worker or the loss of production that results from not replacing a worker who is unavailable due to a religious conflict can amount to undue hardship." *Lee v. ABF Freight System, Inc.*, 22 F.3d 1019, 1023 (10th Cir. 1994).

Costs to the employer are not the only means by which undue hardship can be established.  Rather, "[a]n employer may prove that an employee's proposal would involve undue hardship by showing that *either* its impact on coworkers *or* its cost would be more than de minimis." *Bhatia v. Chevron U.S.A., Inc.*, 734 F.2d 1382, 1384 (9th Cir. 1984) (emphasis added); *see also Balint v. Carson City, Nev.*, 180 F.3d 1047, 1054 (9th Cir. 1999) (en banc) ("Undue hardship may also be present when an accommodation would cause more than a de minimis impact on coworkers[.]"); *accord Harrell v. Donahue*, 638 F.3d 975, 980 (8th Cir. 2011) ("[A]n accommodation creates an undue hardship if it causes more than a de minimis impact on co-workers.") (internal citations omitted).  While coworker "grumbling or unhappiness" is insufficient, "actual imposition on co-workers or disruption of the work routine" can constitute undue hardship. *Burns v. S. Pac. Transp. Co.*, 589 F.2d 403, 407 (9th Cir. 1978); *see also EEOC v. Firestone Fibers*

---

[3] Under the FEHA, "undue hardship" is defined as an "action requiring significant difficulty or expense" considered in light of, among other factors, "the nature and cost of the accommodation needed," and "the type of operations, including the composition, structure, and functions of the workforce . . . ."  Cal. Gov't Code § 12926(u).

1   *& Textiles Co.*, 515 F.3d 307, 317 (4th Cir. 2008) ("[A]n employer is not required

2   to accommodate an employee's religious need if it would impose personally and

3   directly on fellow employees.").

4       The costs of providing a proposed accommodation need not be "quantifiable"

5   so long as they are "present and real." *Cook v. Chrysler*, 981 F.2d 336, 339 (8th

6   Cir. 1992). Moreover, "Title VII does not require an employer to actually incur

7   accommodation costs before asserting that they are more than de minimis." *Bruff v.*

8   *N. Mississippi Health Servs., Inc.*, 244 F.3d 495, 501 (5th Cir. 2001); *Virts v.*

9   *Consol. Freightways Corp. of Delaware*, 285 F.3d 508, 519 (6th Cir. 2002) ("[A]n

10  employer does not have to actually experience the hardship in order for the hardship

11  to be recognized as too great to be reasonable.").

12      Dykzeul's proposed accommodations are unreasonable and would have

13  caused undue hardship. First, excusing Dykzeul from having to work all Friday

14  evenings and all Saturdays would have caused Charter to incur more than de

15  minimis costs; Charter would have had to operate with one less DSR during those

16  key hours, resulting in lost efficiencies in the form of lost production, missed sales

17  opportunities, and having to restructure its entire territorial assignment and rotation

18  system. Second, Dykzeul's proposal to work Sundays instead of Saturdays (or her

19  attorneys' suggestion of longer hours on the weekdays) would have negatively and

20  directly imposed upon her supervisor; Swift would have been forced to work

21  additional days and hours on a permanent basis that he otherwise was not required.

22          1.   *Working Saturdays Was A Requirement For DSRs In October*
23               *2015 When Dykzeul Applied*

24      Dykzeul contends that Charter's Saturday work requirement when Dyzkeul

25  applied. But the only competent evidence on this point is the testimony of Swift

26  and Prunty, the only trial witnesses that held positions at Charter who had personal

27  knowledge about Charter's policies and requirements in October 2015.

28      Swift testified that working Saturdays was unequivocally required in October

2015 and explained that the reason was because, historically, it was "the best production day of the week." 7/20/21 Trial Tr. at 150:15-22; 7/21/21 Trial Tr. at 215:20-216:2. Swift explained, moreover, that the requirement was a directive that came from his sales manager, not something that he made up like some sort of rogue supervisor Dykzeul would have the Court believe. *Id.* at 218:7-12.

Swift's testimony is corroborated by Prunty, who was an in-house recruiter for DSRs and screened Dykzeul over the phone. At her deposition, Prunty testified:

Q: Okay. And when you say that you go over the requirements [of the DSR position] during the prescreening, are you re-asking them the exact questions that are in the profile?

A: No.

Q: Okay, so you're asking them different questions?

A: No. I'm just not asking them the questions that are exactly in the profile. What I do is I state what the requirements are, and I ask them are they okay with them, because they already answered them in there that they were, but I'm just going over it again with them. It's more of a conversation instead of a question/answer.

Q: Okay. So you don't ask them verbatim each question that they already answered in the profile?

A: I state what the requirements are for the position, which includes the questions in the profile, and I ask them are they okay with that, and they answer "yes" or "no."

Q: In regards to the hours, what specifically do you state to them the requirement is?

A: That it's required that they work evenings and Saturday.

Q: Okay, so you specifically tell them Saturdays?

A: Yes.

Q: And who told you to say "Saturdays" instead of "weekends"?

1    A: I – that's how I was trained because that's the requirements of the

2    position.

3    Dkt. 148, Prunty Dep. at 32:21-34:1.

4        Swift's and Prunty's testimony credibly establish that DSRs were required to

5    be available to work Saturdays at the time of Dykzeul's application.  As a sales

6    supervisor, of course, Swift knew what days Charter required DSRs to be available

7    to work.  He held a management position and his responsibilities included

8    supervising, interviewing, and hiring DSRs.  Prunty, a recruiter, was likewise privy

9    to what days DSRs worked because she was responsible for reviewing applications

10   and screened candidates to ensure that those who interviewed met the minimum

11   requirements, including the ability to work Saturdays.  The two of them were in

12   managerial and human resources positions, and both had personal knowledge about

13   the relevant company policies and requirements for DSRs.

14       Dykzeul also attempts to dispute that working Saturdays was required in

15   2015 with the anecdotal experiences of three former DSRs – Krystyna Amaral,

16   Daniel Blond, and Neila Denneen – who worked under Swift at various times.

17       Two of them, Amaral and Blond, didn't start working for Charter until more

18   than two years after Dykzeul applied and thus have no relevant personal knowledge

19   about what the schedule requirements were in October 2015.  Moreover, whatever

20   personal knowledge they do have actually confirms that Charter expected and

21   required its DSRs to work Saturdays.  Blond testified that Swift told him during his

22   interview that DSRs worked "Monday through Friday from 11:00 a.m. to 8:00 p.m.

23   and then on Saturdays from 9:00 to 3:00, and with me that wasn't an issue."

24   7/20/21 Trial Tr. at 45:10-23.  Amaral similarly testified that Swift told her during

25   her interview that DSRs worked Monday through Friday and Saturdays.  *Id*. at

26   91:23-92:4.

27       The third, Denneen, was hired and managed by someone else until Swift

28   became her supervisor around the end of her time with Charter in 2016.  Dkt. 153,

Denneen Dep. at 10:2-11:13, 16:6-15.  And although she testified at her deposition that whoever hired her *in 2013* told her working Saturdays was optional, that was approximately two years before Dykzeul applied to Charter, and she acknowledged that after Swift became her supervisor (right around the time Dykzeul applied) that he would "push" her to work Saturdays, like "you got to work Saturdays." *Id*. Finally, Denneen testified she had "major surgery" while she was employed at Charter and that she had "a lot going on, so a lot of things are kind of a blur" to her. *Id*. at 106:3-13.  In light of Denneen's testimony that when Swift became her supervisor, he pushed her to work Saturdays, and that her recollection of matters from that time period are a "blur," her testimony actually reinforces that working Saturdays was expected and required at the time of Dykzeul's application.

In sum, the credible testimony of Charter's management and human resources personnel establishes that DSRs were required to work Saturdays when Dykzeul applied for the position.  The speculative and subjective beliefs of non-management employees, two of whom weren't even employed when Dykzeul applied, do not convincingly call into question that requirement.

2.     *Exempting Dykzeul From Working Friday Evenings and Saturdays and Adjusting Her Performance Goals Would Have Resulted in Lost Efficiencies*

Dykzeul first proposes that Charter could have excused her from having to work all Friday evenings and all Saturdays entirely, adjusted her performance expectations, and allowed her to work a reduced four-and-a-half-day schedule.  But this accommodation obviously would have resulted in lost production and missed sales opportunities.

Addressing "the extent of [a]n employer's obligation under Title VII to accommodate an employee whose religious beliefs prohibit him from working on Saturdays," 432 U.S. at 66, the Supreme Court in *Hardison* held that the employer was not required to permit the plaintiff to work a four-day week when necessary in order to avoid Saturday shifts so that he could observe the Sabbath.  If the employer

did not replace the plaintiff it would be left short-handed during the weeks that the plaintiff did not work Saturday, and the alternatives of pulling personnel from other departments to fill in for the plaintiff or paying premium wages to employees not scheduled but willing to work involved costs to the employer "either in the form of lost efficiency in other jobs or higher wages." *Id*. at 84. Each alternative, the Supreme Court concluded, would amount to undue hardship because the employer would be required to "bear more than a de minimis cost." *Id*. at 84.

Applying the Supreme Court's holding and rationale in *Hardison*, Dykzeul's proposal that she simply be excused from working Saturdays would involve more than de minimis costs to Charter and cause undue hardship. At the time of Dykzeul's application, Charter required and expected its DSRs to work six days a week, Monday through Saturday. The requirement that DSRs work Saturdays was not arbitrary. First, Saturdays were generally the most productive day of the week. Second, it was important for DSRs to work Saturdays to increase the chances of reaching all decision makers in a particular household, and of reaching certain segments of the population that are usually not home during the usual hours that DSRs worked on the weekdays, such as people who work unconventional hours Monday through Friday. As sales supervisor Swift explained at trial:[4]

> Q: In the October 2015 time period, was availability to work on Saturdays a requirement for DSRs who reported to you?
>
> A: Yes.
>
> Q: Why was that?
>
> A: Because Saturday typically was, throughout history in this business, since I've been in the business, Saturday was the best production day of the week.

---

[4] Swift has extensive experience – over 30 years – in door-to-door sales in the cable industry as a sales representative and supervisor, at Charter and with other companies including for period of time his own business.

Q: And with respect to the Saturday work, what was your concern there?

A: Well, again, Saturdays, are really the most productive day of the week.  If we don't work Saturdays, there are people we'll never contact and there are lost sales that I don't believe, if you're working the proper hours on Monday through Friday, I don't believe you're going to make it up.

. . .

Q: In your experience, did you find that within a group of – let's say – 400 addresses, that the people who were likely to be home differed between, say, during the weekday, during the weekday evening, and during a weekend?

A: Yes.

Q: And could you explain?

A: There are people that maybe they're out of town during the weekdays, maybe they have a job out of town and they come home on the weekends. First of all, it's very difficult to contact a hundred percent of your leads. I don't think anyone ever did it. But during the weekdays, you have – roughly, we had three to four hours of really productive time, that's the evenings [sic] time, to really contact decision-makers. You can't get to all your leads in five days. So Saturday, Saturday morning, Saturday evenings, you found that you did contact those people that lived in the addresses that are habitually not home.
The exact reasons why we couldn't seem to catch them on the weekdays, I don't know exactly why. But I'm sure there are a number of variables.
. . .

Q: Okay. So in your experience were there some customers who are more likely to be available and contacted on a Saturday than they were other days of the week?

Mr. Cherne: Same objections.

The Court: Well, I want to hear the answer but I don't –

(laughing).

The Witness: Well, you're more likely, because people – most people work a five-day workweek, you're more likely to contact, if it's a married couple or roommate situation, you're just more likely to contact both decision-makers or all decision-makers in that address.

And that's really what you – that's really what you want. You don't want the case to where you contact the husband and he defers: Gee, I can't do anything until I talk to my wife. So it accelerates the closing process if all the decision-makers in the home are home at the time you contact them.

7/21/21 Trial Tr. at 213:14-215:8, 215:20-216:2, 225:9-18.

Put simply, the job of DSRs is to sell.  If Charter excused Dykzeul from *ever* having to work Friday evenings or Saturdays, it necessarily meant that Swift's team would have had to operate indefinitely with one less DSR on Saturdays.  Naturally, a salesperson who works five days a week knocks on fewer doors, and follows up on fewer leads, than if he or she worked six days a week.  Fewer doors knocked means fewer contacts with prospective customers, which are critical to making sales.  The loss in productivity and missed sales opportunities that would result from Dykzeul working a permanently reduced schedule is self-evident.

Accordingly, Dykzeul's suggestion that Charter simply excuse her from *ever* having to work a Friday evening or Saturday, when no other DSRs received the same guarantee, is an unreasonable accommodation that would have caused a more than de minimis burden on the conduct of Charter's business.[5]

---

[5] Moreover, if Charter permanently excused Dykzeul from ever having to work Friday evenings and Saturdays, it would be treating her more favorably than other DSRs solely because of her religious beliefs.  She would never have to work Friday evenings or Saturdays, while other DSRs were expected and scheduled to work.  No other DSRs requested, or received, *every* Friday evening or Saturdays off.  The Ninth Circuit has stated that *Hardison* bars " 'preferential treatment of employees' " on account of religion.  *Opuku-Boateng*, 95 F.3d at 1469-70 (9th Cir. 1996) (quoting *Tooley v. Martin-Marietta Corp.*, 648 F.2d 1239, 1243 (9th Cir. 1981). An accommodation that would completely exempt Dykzeul from one day of work

### 3. *Dykzeul Could Not Work Sundays Instead Of Saturdays Without Undue Hardship Because Her Supervisor Would Have To Work On His Only Day Off*

Dykzeul next proposes that Charter should have accommodated her by permitting her to work Sundays instead of Saturdays. But doing so would have caused a real and actual imposition upon Swift, who would have to work seven days a week without a day off.

It is undisputed that Swift worked six days a week, Monday through Saturday, at the time of Dykzeul's application and that he would have to be on call Sundays – and thus work seven days a week – if Dykzeul worked Sundays instead of Saturdays. 7/21/21 Trial Tr. at 225:16-227:12. Also undisputed is the fact that Swift needed to be on call and, at a minimum, available by phone to answer any questions and address any issues that might arise when DSRs were out in the field, including responding when necessary to any accidents or incidents that they might be involved in. *Id*. at 205:22-209:6, 211:7-16.

Swift testified that he received calls from DSRs for a variety of reasons, including upset customers, technicians that missed an installation appointment with customers, pricing issues, and questions about the product or competitors. 7/21/21 Trial Tr. at 205:22-208:16. He received numerous calls from DSRs, sometimes five to ten a day. *Id*. There were also occasions as a supervisor for Charter when Swift had to respond to situations involving injury to his DSRs. *Id*. When DSRs were injured on the job, Swift had to take them to the urgent care or meet them there, go to scene where the injury occurred to investigate and try to contact witnesses, and prepare and submit an accident report to human resources. *Id*. Each incident took several hours for him to do what he needed, depending on where they occurred. *Id*.

Because Swift was required to be on call whenever DSRs were in the field,

---

that other DSRs were expected and scheduled to work would amount to the very "preferential treatment" that the Ninth Circuit has said *Hardison* prohibits.

1  accommodating Dykzeul's request to work Sundays instead of Saturdays

2  necessarily meant that Swift would have to work seven days a week.  Dykzeul

3  trivializes the significance of being on call and in doing so ignores the fact that

4  Sundays were Swift's only regular day off entirely free from any work obligations.

5  Swift often received calls from DSRs in the field regarding various issues and

6  sometimes even had to physically respond to a location, investigate, and prepare a

7  report when they got hurt.  If Dykzeul worked a permanent Sunday schedule, Swift

8  would never have a day off completely free from work obligations and would be

9  restricted in the types of leisure activities he could engage in on Sundays.

10      This real and negative impact on Swift constitutes an undue hardship.

11  Where, as here, an employer would have to impose on an employee additional

12  responsibility to accommodate another employee's Sabbath observance, courts have

13  consistently held that accommodation need not be provided because undue hardship

14  would result.  *See, e.g.*, *Eversley*, 843 F.2d at 176. ("[I]t is unreasonable and an

15  undue hardship on an employer to require the employer to force employees, over

16  their express refusal, to permanently switch from a daytime to a nighttime shift in

17  order to accommodate another employee's different Sabbath observation."");

18  *Harrell*, 638 F.3d at 980 ("[I]f accommodating an employee's religious beliefs also

19  causes a 'real' and 'actual' imposition on co-workers, Title VII does not require an

20  employer to make such an accommodation."); *Chrysler Corp. v. Mann*, 561 F.2d

21  1282, 1285 (8th Cir. 1977) ("Nor do we think that an employer should have to

22  adjust its entire work schedule to accommodate individual religious preferences and

23  practices."); *Vaughn v. Waffle House, Inc.*, 263 F. Supp. 2d 1075, 1084-85 (N.D.

24  Tex. Mar. 5, 2003) (holding that employer established undue hardship where it was

25  undisputed another district manager or senior member of management had to give

26  up their weekend days off to cover the plaintiff during his Sabbath; "where . . . an

27  employer's accommodation would force other employees, against their wishes, to

28  modify their work schedules to accommodate the religious beliefs of a particular

employee, the same constitutes an undue hardship."); *EEOC v. Dalfort Aerospace, L.P.*, 2002 WL 255486, at *4 (N.D. Tex. Feb. 19, 2002) ("An accommodation that would force other employees, against their wishes, to modify their work schedules to accommodate the religious beliefs of the complaining employee would be unreasonable and an undue hardship.").

Relying on testimony from Blond and Amaral that they could work occasional Sundays if they wanted, Dykzeul contends that letting her work Sundays instead of Saturdays wouldn't result in any hardship to Swift because he let other DSRs work some Sundays.  But that is comparing apples to oranges.  As Swift testified, DSRs occasionally worked a Sunday if they wanted to make some additional income or were behind on their targets, but such instances were "extremely rare", and he could only recall it happening a few times over his seven years with Charter.  7/20/21 Trial Tr. at 170:9-171:5; 7/21/21 Trial Tr. at 211:5-16.[6] There is a stark difference between having to be on call an *occasional* Sunday, which Swift was willing to do, and being forced to be on call *every* Sunday on an indefinite and permanent basis, which Swift was unwilling to do.  *See Eversley v. MBank Dall.*, 843 F.2d 172, 176 (5th Cir. 1988) ("[I]t is unreasonable and an undue hardship on an employer to require the employer to force employees, over their express refusal, to permanently switch from a daytime to a nighttime shift in order to accommodate another employee's different Sabbath observation.").  The fact is Swift earnestly wanted to hire Dykzeul and thought long and hard about working seven days a week.  That he ultimately concluded he would not be able to handle it, after working six days a week for 30 years, is perfectly reasonable and understandable.  226:6-227:12.

---

[6] Neither Blond nor Amaral testified at trial how many times or how often they worked on a Sunday.

4.     *Dykzeul Could Not Work Longer Hours On Weekdays Without
Undue Hardship Because Charter Would Suffer Lost
Efficiencies*

Lastly, Dykzeul suggests that Charter could have allowed her to work longer hours on weekdays instead of Saturdays.  However, substituting prime hours when people are more likely to be home (Saturday) with unproductive hours (weekday mornings and late evenings) would have resulted in lost efficiencies and therefore undue hardship.

At the time of Dykzeul's application, DSRs worked 11 a.m. to 8 p.m. on weekdays (SF No. 8), which means that she would have to work in the early mornings before 11 a.m. and late in the evenings after 8 p.m. to make up her Saturday hours.  But Swift and Dykzeul's own witness, Daniel Blond, explained at trial why there was no point to working in the mornings on the weekdays.

Swift explained that most people work Monday through Friday, and the best hours on weekdays to try and sell Charter's services were after people got home from work.  7/21/21 Trial Tr. at 201:12-23; 245:11-14.  This observation was confirmed by Blond, who aptly testified:

> Q: Okay. Now, although you were permitted to start working
> early on a given day, in your experience you didn't see the point
> of starting at 8:00 or 9:00 in the morning, did you?
>
> A: I did I several times and saw no reflection of any more
> contacts during that time period because, like I said, normally
> more contacts you would have is after 3:00 p.m.  You really,
> between 11:00 and 1:00 or 2:00, you're basically walking
> around half-empty neighborhoods. Everybody – the majority of
> everybody is, you know, working during the day. The working
> class people trying to save money are normally the ones you try
> to sell the most and so.
>
> . . .
>
> Q: And in your experience the main portion of DSR sales
> happen between 5:00 and 8:00 p.m. on the weekday?

35

1   A: Correct.

2   7/20/21 Trial Tr. at 72:3-73:5.

3   Blond also explained succinctly why working late into the evenings wasn't

4   practical: "Your contacts go far down once it starts getting dark outside."  7/20/21

5   Trial Tr. at 57:24-58:10.

6   It is common sense that people are generally more likely to be home on

7   Saturdays than on weekdays during normal work hours, more people are likely to

8   be home on weekdays after school and work, typically in the late afternoon and

9   early evening, and most people likely would not appreciate salespersons knocking

10  on their doors late at night.  Charter required its DSRs to work Saturdays so that

11  they could reach portions of the population who are regularly not home on the

12  weekdays.  7/21/21 Trial Tr. 225:9-18.  Substituting a DSR's prime hours on

13  Saturdays when people are more likely to be home with unproductive hours on the

14  weekdays at times when people are either less likely to be home (mornings) or less

15  receptive (late evenings) reduces the pool of potential customers with whom the

16  DSR makes contact.  This loss in efficiency would have amounted to more than de

17  minimis cost and an undue hardship to Charter's conduct of its business.

18  **C.   Charter Did Not Intentionally Discriminate Against Dykzeul**
    **Because Of Her Religion Or Religious Beliefs**
19

20  Dykzeul's claim that Charter intentionally discriminated against her because

21  of her religion or religious beliefs is easily dispensed with because the record

22  clearly demonstrates that the decision not to hire Dykzeul was not motivated by any

23  discriminatory animus.

24  "[L]iability for disparate treatment hinges upon proof of discriminatory

25  intent."  *Am. Fed'n of State, Cty., & Mun. Emps., AFL-CIO (AFSCME) v. State of*

26  *Wash.*, 770 F.2d 1401, 1406 (9th Cir. 1985).  The parties have stipulated that:

27  (1) Swift thought Dykzeul had potential *and wanted to hire her*; (2) Swift was the

28  sole decision-maker concerning Dykzeul's employment application; (3) Swift

1   concluded that he couldn't accommodate Dykzeul by letting her work Sundays

2   instead of Saturdays because it would require him to work seven days a week; and

3   (4) the *only* reason Swift didn't hire Dykzeul was because she couldn't work on

4   Saturdays.  SF Nos. 13, 14, 16, 17.  These stipulated facts alone preclude any

5   finding of discriminatory motive behind the decision not to hire Dykzeul, and there

6   can be no contention that Swift had an improper motive or that his proffered reason

7   for not hiring Plaintiff was pretextual.

8         Dyzkeul argues in her closing brief that "Swift plainly treated other DSRs

9   differently . . . because Dykzeul was unavailable on Saturdays due to her religion."

10  Not true.  Swift did not hire Dykzeul because she was unavailable on Saturdays, not

11  because she was unavailable on Saturdays on account of her religion.  In other

12  words, Swift did not care *why* Dykzeul couldn't work Saturdays, only that she

13  couldn't.  Indeed, Swift testified that he interviewed other applicants in the past

14  who also stated that they were unavailable on Saturdays and he did not hire any of

15  those individuals.  7/21/21 Trial Tr. at 217:22-2189:6.

16        Dykzeul tries to persuade the Court that the decision not to hire her was the

17  result of intentional discrimination with the anecdotal and personal experiences of

18  three DSRs.  But two of the DSRs, Blond and Amaral, were not hired until two or

19  more years after Dykzeul applied for the position and are thus not appropriate

20  comparators – i.e., their experiences are not evidence that similarly situated

21  individuals were treated more favorably *when Dykzeul applied* two or more years

22  prior.  The third DSR, Denneen, was hired and managed by some other supervisor

23  until Swift became her supervisor, at which point Denneen acknowledged that

24  Swift impressed upon her that she had to work Saturdays.  Dkt. 153, Denneen

25  Depo. at 11:3-13.

26        In short, Swift's decision was not motivated by Dykzeul's religion, but her

27  unavailability to never, ever – without exception – work a Saturday if she was

28  hired.  Dykzeul has not identified a single "similarly situated" applicant who,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

37

without exception, could never work a Saturday and yet was hired, and there is no evidence of any other circumstances suggesting discriminatory animus, hostility, or intent.  The only reasonable conclusion that can be reached in this case, based on the stipulated facts and evidence, is that Swift didn't hire Dykzeul was because she couldn't work Saturdays.  The reason she couldn't work Saturdays was completely irrelevant to Swift.  There was no discriminatory intent, and without discriminatory intent there can be no intentional discrimination.[7]

---

[7] As the Court observed in its ruling on the parties' cross-motions for summary judgment and partial summary judgment:

> "[T]he Court is skeptical that Plaintiff will be able to succeed on her disparate treatment theory.  Plaintiff's claim fits more naturally under the failure to accommodate rubric and it would be superfluous if the same facts supported liability under Title VII for both failure to accommodate and disparate treatment."  Dkt. 64 pp. 17-18.

The Court ultimately denied summary judgment on Dykzeul's intentional discrimination claim because it believed that she submitted sufficient evidence to raise a triable issue whether Charter's proffered explanation why Dykzeul was not hired was pretextual.  In particular, the Court found that Dykzeul's evidence, at the summary judgment stage, was "sufficient to call into question whether 'the [Saturday] work rule applies to all employees[.]' "

At the time, the parties had not yet stipulated for purposes of trial that *the only* reason Swift did not hire Dykzeul is because she could not work Saturdays.  Again, given the parties' stipulation, Dykzeul cannot show pretext.

Moreover, whether working Saturdays was actually required, a disputed fact in this case, has no bearing on the question of discriminatory intent.  Swift's true reason for not hiring Dykzeul, if nondiscriminatory, need not have been an actual work requirement.  *See Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 358 (2000).  This is because  "a plaintiff in a discrimination case must show discrimination, not just that the employer's decision was wrong, mistaken, or unwise."  *Veronese v. Lucasfilm Ltd.*, 212 Cal. App. 4th 1, 21 (2012).  Thus, "an employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."  *Arteaga v. Brink's, Inc.*, 163 Cal. App. 4th 327, 344 (2008).  "[T]he ultimate issue is simply whether the employer acted with *a motive to discriminate illegally*.  Thus, 'legitimate' reasons . . . in this context are reasons that are *facially unrelated to prohibited bias*, and

## V.   **DAMAGES**

Dykzeul seeks back pay, emotional distress damages, and punitive damages. If the Court finds for Dykzeul on any of her claims, it should: (1) calculate back pay using the average of Turlock DSR earnings for the three-year period after her application to estimate what her earnings would have been had Charter hired her; (2) adopt Charter's expert Aukstikalnis' valuation method for lost benefits; (3) find that Dykzeul fully mitigated her economic losses by 2017; (4) find that Dykzeul's right to back pay terminated no later than October 31, 2017, when she found a higher-paying substantially equivalent sales position with Patient Care; (5) find that Dykzeul failed to exercise reasonable care to maintain substantially equivalent employment when her performance led to Patient Care terminating her employment for cause; (6) find that Dykzeul is entitled to only minimal damages, if at all, for garden variety emotional distress because there is no evidence that she suffered any serious emotional harm as a result of not getting the DSR job; and (7) find that the evidence in this case does not support an award of punitive damages.

### A.   **Back Pay**

#### 1.   *Dykzeul's Post-Charter-Application Earnings*

After Dykzeul interviewed for the Charter DSR position on October 15, 2015, she obtained subsequent employment as outlined in Section III.F. above.  The parties have stipulated to Dykzeul's post-Charter-application earnings and value of benefits for the period October 2015 through the first six months of 2021 as follows (SF Nos. 20-38):

| Year | Total Earnings | | Value of Earnings Plus Benefits |
|---|---|---|---|
| 2015 | AppStar: | $2,823 | $2,823 |

---

which, if true, would thus preclude a finding of *discrimination*."  *Guz*, 24 Cal. 4th at 358 (citation omitted) (emphasis in original).

| 2016 | AppStar: $7,865.17<br>Heartland: $10,991.72<br>Life Alert: $8,087.50<br>Total: $26,944.39 | $26,944.39 |
|---|---|---|
| 2017 | Life Alert: $58,849.00<br>Patient Care: $10,769.24<br>Total: $69,618.24 | $71,449.01 |
| 2018 | Patient Care: $26,301.10<br>National Debt: $738.56<br>Millenia Tax: $800.00<br>Aflac: $1,264.11<br>Total: $29,103.77 | $33,574.96 |
| 2019 | Goldco: $39,680.28 | $46,534.05 |
| 2020 | Goldco: $120,466.83 | $140,946.19 |
| 2021 (through first 6 months) | Goldco: $179,361.50 | n/a |

### 2. *Average Turlock DSR Earnings Should Be Used To Estimate Dykzeul's Lost Earnings, Not Puffery From A Job Advertisement As Advocated By Her Expert In His First Two Damages Models*

Estimating economic loss in a failure-to-hire case is inherently speculative. Even more so when, as here, potential earnings are not based on a fixed salary or hourly rate but a base salary plus commissions. Commissions invariably depend on sales and performance, and not having ever done the job, it is impossible to know how an applicant would have performed if he or she had been hired.[8]

The Court should use the average of Turlock DSR earnings for the three-year period after Dykzeul's application to estimate her lost earnings. Charter's expert, Amy Aukstikalnis, analyzed the earnings data for the 29 Turlock DSRs that worked between October 2015 and October 2018 and calculated their average annual earnings. After trial, Dykzeul raised new objections to Trial Exhibit 35, the

---

[8] That Dykzeul asks the Court to award two different amounts for lost earnings that differ by nearly $200,000 just goes to show how speculative are her economic damages.

compensation data relied upon by Aukstikalnis and Dykzeul's expert, Nutten, in his third damages model.  *See* Dkt. 155.  Charter thereafter produced an updated version of Trial Exhibit 35, with more complete data (the prior version had included all base pay and commissions, but inadvertently omitted certain bridge payments and paid time off, among other types of non-base, non-commission compensation), and produced witness Martin Armstrong per the Court's order for deposition (Dkt. 164), where he authenticated the updated version of Trial Exhibit 35 and was available for cross-examination.  Dkt. 173-2, Banks Decl. ¶¶ 3-9, Ex. C (Updated Trial Exhibit 35); Ex. D (Armstrong Dep. at 32:24-33:3, 34:11-36:22).

Aukstikalnis has now reviewed the updated and complete data in updated Trial Exhibit 35 and updated her calculations from trial accordingly.  Her Supplemental Trial Declaration, which maintains the same opinions but includes her updated calculations, is being filed concurrently with this brief as an exhibit. *See* Dkt. 173-1.  Importantly, the updated data did not change any of her methodology or opinions, but it did yield slightly higher damages estimates, meaning that the new numbers are in Dykzeul's, and not Charter's, favor.

Based on the updated Trial Exhibit 35 data, Aukstikalnis now calculates the average annualized earnings for the 29 Turlock DSRs that worked between October 2015 and October 2018 to be $35,577 and the median to be $31,768 during the three-year period (in her initial calculations, the average was $30,346 and the median was $24,985 (Dkt. 143 at 3:24-26)); Dkt. 173-1, ¶ 8.  As Aukstikalnis explained in her trial testimony, utilizing the three-year average of *all* DSRs who worked in Turlock is appropriate because it is based on actual data rather than speculative assumptions, and because it accounts for the economic reality that some DSRs may be stellar, others might enjoy only moderate success, and still others may flounder and flame out quickly (as most DSRs do).[9]  7/21/21 Tr. at 362:15-

---

[9] Aukstikalnis testified that about 73.3% of Charter DSRs in Turlock between October 2015 and October 2018 worked as a DSR for less than nine months.

363:1, 364:11-15, 370:14-25; Dkt. 143, at 4:4-5.

Dykzeul contends, and her expert Nutten assumes, that Dykzeul would have been a superstar performer at Charter, but the only basis for this claim is Dykzeul's hopes and beliefs and her testimony about how she *claims* to have performed in other jobs.  But there is no reason to believe Dykzeul's testimony that she performed well in her other jobs.

To the contrary, Dykzeul is a serial job-hopper who, until her current job with Goldco, regularly changed jobs every few months.  Dkt. 143, ¶ 17; *see also supra*, Section III.F.  Dykzeul has worked for 11 different employers since 2011 with an average length of employment of 8.6 months.  *Id*.  Looking at just the three jobs that Dykzeul held in the five years before her Charter application, her average length of employment was 9.6 months.  *Id*.  As of the trial in July 2021, Dykzeul has held eight different jobs since her Charter application with an average job length of 8 months.  *Id*.

Moreover, the records and testimony of the human resources representative from Patient Care establish that Dykzeul was an underachiever who struggled to make sales, was disorganized, and ultimately was terminated for poor performance. Dkt. 165, TE 55, pp. 11-14; Dkt. 158, 7/22/21 Tr. at 7:8-13, 11:14-15:25, 19:23-20:21.  Dykzeul tried to hide this fact by lying, under oath, about her performance at Patient Care (claiming she got a stellar 90-day review when in fact it reflected poor performance), asserting she did not to know why her employment there was terminated, and also improperly redacting the records from Patient Care in the apparent hope that Charter and the Court would never learn the truth.  In light of Dykzeul's serial efforts to obstruct the truth about her time at Patient Care, there is no reason to believe her claims about her allegedly great performance at any other job and reason to believe she would have been a superstar performer at Charter.  To the contrary, there is every reason to believe that Dykzeul would have washed out at Charter well before nine months passed.

1       Being charitable and disregarding the weight of evidence that Dykzeul would

2   not have been a successful DSR at Charter, the best and most neutral predictor of

3   how Dykzeul would have performed had she been hired at Charter would be to look

4   at how others who worked during the same time period and in the same region

5   actually fared during the same time period.  Using a three-year average of DSR

6   earnings as the back pay rate avoids unnecessary speculation and better reflects

7   what Dykzeul could be expected to have earned had Charter hired her.  That is what

8   Charter's expert, Aulkstikalnis, did in forming her opinions.  7/21/21 Tr. at 362:15-

9   363:1.

10      In contrast, Dykzeul's expert, Nutten, offers two damages models that

11  disregard all the real-world data and rely on statements about earning "potential"

12  from a job advertisement.  In these models, Nutten asks the Court to simply assume

13  Dykzeul would have been a top performing DSR at Charter because she had sales

14  experience before she applied with Charter and because she has had some success

15  in at least one sales position since her Charter application.  But that is a false

16  equivalency.  As Dykzeul's own experience confirms, success in one sales position

17  is not necessarily predictive of success in others.  Case in point: she has apparently

18  found success at Goldco but Patient Care fired her because she did not perform well

19  for them.

20      In creating his first two damages models, Nutten next assumes that, as a

21  high-achieving DSR, Dykzeul would have made either $100,000 or $75,000 a year

22  in total compensation based on a job description in an advertisement that provided

23  those two figures as examples of a DSR's earnings "potential" *if sales targets are

24  met*.  Specifically, the advertisement states, in relevant part: "*If sales targets are

25  met*, the average earning *potential* is $75k. The top tier reps *can* make upwards of

26  100K!"  Ex. 29 (emphasis added).

27      As Swift testified, the claims made in the job advertisement were accurate

28  because they described earnings "potential" if a DSR met all of his or her sales

targets.  7/21/21 Tr. at 220:21-222:8.  However, the vast majority of DSRs did not meet those targets or achieve those potential earnings.  *Id.*  Specifically, the targets referenced in the advertisement referred to DSRs that regularly met their sales targets of 21 "triple play" sales (cable, internet and phone service) each month.  *Id*.  In 2015, Swift only had *one* DSR who regularly met that sales target each month.  7/21/21 Tr. at 222:9-24.  Damages models should be based on facts and data, not puffery from a job advertisement about earning "potential" that was only achieved by one person.

In reality, sales jobs vary widely in terms of product demand elasticity, compensation structure, and conditions.  For example, at Goldco, Dykzeul sells gold and silver and receives 3.5% commission for the former and 5% for the latter.  Dkt. 142, ¶ 27.  Customers are required to make minimum purchases of $10,000 for cash accounts and $25,000 for retirement accounts.  *Id*.  This means Dykzeul makes a minimum of $350-$875 for each gold and $500-$1,250 for each silver sale.  Contrast Dykzeul's ability to earn commissions at Goldco with Charter's DSR commission plan, under which Dykzeul would have received a flat sum for each sale, which varied depending on whether she sold bundled or single services, and whether she qualified for accelerators that would increase the amount of the fixed sum based on her number of sales.  TE 9.  But before she would be eligible to receive commissions at all, Dykzeul would have had to sell a minimum of 10 "triple plays" each commission period.[10]  *Id*. at p. 5.  In other words, even if she had 100 internet sales and 100 "double play" sales, but 9 or fewer "triple play" sales, Dykzeul would have received <u>zero</u> in commissions.

The earnings data reflects that a meager *1 out of 29 DSRs (approximately 3%)* in Turlock between October 2015 and October 2018 actually earned more than $75,000 a year.  Dkt. 143 at 3:27-28.  Further, as Swift explained at trial, it is

---

[10] A "triple play" is a bundle of all three Charter services while a "double play is a bundle of internet and either cable or telephone.

difficult for DSRs to make sales, the position has a high turnover rate, and DSRs typically left because they couldn't make enough money and had to deal with the rejection they "receive every day which is probably about 98 percent of the people" they encounter.  7/21/21 Trial Tr. at 236:16-22; 237:20-280:21.  Blond and Amaral, who were called by Dykzeul, also corroborated that it was difficult to make a lot of money as a DSR.  Amaral testified that while she was able to meet the minimum threshold and sell enough to "keep [her] employment," she never sold enough to qualify for the commission accelerators.  7/20/21 Trial Tr. at 109:18-110:6.  She also confirmed that DSRs faced a lot of rejections ("We would play a game of see who got the record of how many nos they would hit that day.").  *Id*. at 117:7-10  Blond testified that while he did relatively well in his first month, making $14,000 in base plus commissions, his total compensation went down to $6,000 in the second month, $2,500 the month after that, and then $1,500 in his last month as a DSR, when he finally decided to quit because he wasn't sure he was even going to have enough qualifying sales to meet the minimum threshold to be eligible for commissions.  *Id*. at 73:6-75:3.  Notably, Blond's precipitous drop in sales coincided with the time period when he started taking some Saturdays off.  *Id*. at 65:5-10.

In sum, Dykzeul's approach to calculating back pay relies entirely on speculative and unsupported assumptions, while Charter's models look at what the average DSR actually made during the relevant time period as the measure of Dykzeul's lost earnings.  Nutten's first two models should thus be disregarded as unhelpful and not based on the evidence, while Aukstikalnis's models should be accepted, to the extent any damages analysis is necessary in this case.

> ### 3. *Dykzeul's Third Damages Model Should Be Disregarded Because It Utilizes Unreliable Methodology Based On Unrepresentative, Cherry-Picked Data*

Nutten's third damages model, which uses a weighted average to estimate Dykzeul's lost earnings, should be disregarded because the methodology he

1   employs of picking and choosing favorable data while ignoring unfavorable data

2   renders his calculations speculative and unreliable.

3       Nutten arrived at the weighted average he uses by cherry picking the earnings

4   of six of the longest tenured and disproportionately higher-earning Turlock DSRs,

5   while ignoring the earnings of the other 23 DSRs in the available data set.  In other

6   words, Nutten uses data that is most favorable to Dykzeul while excluding the most

7   unfavorable.  By ignoring the earnings of approximately 80% of the Turlock DSRs

8   during the three-year period after Dykzeul's Charter application, Nutten estimates

9   Dykeul's lost earnings using what is in effect a "successful DSR" average.  As

10   discussed, however, there is no objective or reliable basis to assume that Dykzeul

11   would have been a long-term successful DSR.

12       " 'Cherry-picking' data is essentially the converse of omitting it: just as

13   omitting data might distort the result by overlooking unfavorable data, cherry-

14   picking data produces a misleadingly favorable result by looking only to 'good'

15   outcomes." *E.E.O.C. v. Freeman*, 778 F.3d 463, 469-70 (4th Cir. 2015) (Agee, J.,

16   concurring).  Because Nutten's third model is based on cherry-picked data that was

17   designed to produce an overly-favorable result, it is based on unsound methodology

18   and is not an appropriate, reliable, or useful measure of damages.  It should be

19   disregarded.

20           *4.*    *Dykzeul's Damages Models Also Inflate The Value Of Her*

21                *Alleged Lost Benefits From Charter*

22       Nutten estimated the value of benefits Dykzeul would have received as a

23   Charter DSR to be 17% of her earnings each year.  According to Nutten, that

24   percentage is based on generalized Bureau of Labor Statistics benefits data that

25   included benefits that Dykzeul would not have received as a DSR.  Dkt. 141, ¶ 6.

26   Aukstikalnis, on the other hand, estimated the value of the two specific types of

27   benefits for which Dykzeul would have been eligible, medical insurance and

28   retirement benefits.

Aukstikalnis estimated the value of Charter health benefits using data from the 2015 and 2016 Kaiser Family Foundation Annual Employer Health Benefits Survey.  Dkt. 143, ¶ 26.  According to that survey, the average employer contribution for health benefits, all plan types, was $5,176 in 2015, $5,306 in 2016, and $5,477 in 2017. *Id.*  For retirement benefits, because DSRs are eligible to participate in a company 401(k) saving plan with an employer match of up to 3% of wages, Aukstikalnis assumed Dykzeul would have made contributions to the 401(k) plan had she been hired and received the maximum company 401(k) matching contribution of 3%.  Dkt. 143, ¶ 27.

Under Nutten's methodology, the value of Dykzeul's benefits arbitrarily and inexplicably increase the more she is projected to earn.  For example, in his Opinion 2, Nutten assumes Dykzeul would have earned $75,000 a year as a DSR and values her lost benefits at $12,750 per year (17% x $75,000).  In his Opinion 1, Nutten assumes that Dykzeul would have earned $100,000 a year and thus values her lost benefits at  $17,000 per year (17% x $100,000).  But Nutten offers no explanation why, for example, the same medical insurance is worth more if Dykzeul earned $100,000 annually instead of $75,000.

Nutten's method for valuing Dykzeul's lost Charter benefits is unsound, overly generalized, and speculative.  The Court should reject his approach and adopt Aukstikalnis' values based on the estimated costs of the specific benefits that Dykzeul would have been eligible for as a DSR, as follows:

|  | 2015 (Oct-Dec) | 2016 | 2017 |
|---|---|---|---|
| Health Benefits | $1,248 | $5,306 | $5,477 |
| 401(k) Match | 3% of earnings | 3% of earnings | 3% of earnings |

5.     *Dykzeul Fully Mitigated Her Economic Losses By 2017*

Dykzeul's earnings and value of benefits from her post-Charter employment,

pursuant to the parties' stipulation, are as follows: $2,823 in the 2.5 months between mid-October and December 2015; $26,944.39 in 2016; $71,449.01 in 2017; $33,574.96 in 2018; $46,534.05; and $140,946.19 in 2020.  SF Nos. 20-38.

As noted, Charter's expert, Aukstikalnis, calculated Dykzeul's estimated lost earnings using the $35,577 average annual earnings of DSRs in Turlock for the three-year period after Dykzeul's application, and she valued Dykzeul's lost benefits using an estimate of what the employer cost would have been for health insurance and the 401(k)-employer match.  She then offset the total of Dykzeul's estimated Charter earnings and benefits with Dykzeul's actual earnings each year to determine Dykzeul's economic loss.  Aukstikalnis' calculations of Dykzeul's lost earnings and benefits are reflected in the table below.  *See* Dkt. 173-1, Ex. 8 – Scenario 1.

| | | 2015 | 2016 | 2017 | |
|---|---|---|---|---|---|
| Estimated Charter Earnings | | $8,572 | $35,577 | $35,577 | |
| Estimated Charter Benefits | Health | $1,248 | $5,306 | $5,477 | |
| | 401(k) | $257 | $1,067 | $1,067 | |
| Total Expected Charter Compensation for Dykzeul | | $10,077 | $41,950 | $42,121 | |
| Less Dykzeul's Actual, Real-World Earnings and Benefits | | ($2,823) | ($26,944) | ($71,449) | |
| **Total Economic Loss** | | **$7,254** | **$15,006** | **$0** | **$22,259** |

As the Court can see, the total of Dykzeul's actual wages and value of benefits received from subsequent employment in 2017 exceeded her estimated Charter earnings and benefits for the year.  The same is true under Nutten's third damages model.  Nutten confirmed in his testimony that Dykzeul earned more in 2017 ($58,849) than what even he projects her expected annual earnings at Charter

1  would have been using his cherry-picked average ($57,349) of Turlock DSR

2  earnings in his third model.  07/21/21 Trial Tr. at 268:4-269:16; TE 26, Nutten's

3  Sched. 4.  Accordingly, under the only two damages models that utilizes actual

4  data, rather than advertising statements, Dykzeul fully mitigated her economic

5  losses in 2017.  Dkt. 143, ¶ 28; *see Abila v. Amec Foster Wheeler USA Corp.*, 216

6  F. Supp. 3d 778, 786 (S.D. Tex. 2016) (holding that the plaintiff was not entitled to

7  back pay or front pay as of the calendar year that he earned more through

8  subsequent employment than he earned or would have earned with the defendant).

9
10
       *6.    The Court Should Cut Off The Back Pay Period No Later Than October 2017 When Dykzeul Secured A Higher-Paying And Substantially Equivalent Position*

11  As discussed, Dykzeul fully mitigated her economic losses by 2017 if the

12  Court uses the average annualized earnings for Turlock DSRs during the three-year

13  period after Dykzeul's application to estimate her earnings, and estimated employer

14  costs to value the benefits she would have received, had Charter hired her for the

15  DSR position in October 2015.  If the Court believes, however, that some other rate

16  should be used to estimate Dyzeul's lost Charter earnings and benefits, it should

17  nevertheless cut off the back pay period no later than October 2017, regardless what

18  measure the Court uses, when Dykzeul obtained a higher-paying full-time sales

19  position with Patient Care that was substantially equivalent to the Charter DSR

20  position.[11]

21  An award for back pay in a failure-to-hire case is generally computed from

22  the date of the refusal to hire until the date of final judgment.  *Thorne v. City of El*

23  *Segundo*, 802 F.2d 1131, 1136 (9th Cir. 1986).  But "the victim of discrimination

24  who finds a better or substantially equivalent job no longer suffers ongoing injury

25

26  [11] Dykzeul asks the Court to award her back pay for the 50.5 months between October 15, 2015, through December 31, 2019; the time of her interview with

27  Charter to when, according to her expert, she fully mitigated her economic losses with Goldco.  *See* Dkt. 141, ¶¶ 8, 46 ("Thus, I have capped her economic loss as of

28  the end of 2019, since she fully mitigated her losses in 2020.").

stemming from the unlawful discrimination." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 236 (1982). Thus, "[w]hen a plaintiff finds employment that is equivalent or better than the position she was wrongly denied, the right to damages ends because it is no longer necessary to achieve an equitable purpose; the plaintiff at that point has been restored to the position she would have been in absent the discrimination." *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 84 (3d Cir. 2009). California law is the same. *Alexander v. Cmty. Hosp. of Long Beach*, 46 Cal. App. 5th 238, 267 (2020) (holding in a wrongful discharge case that "[o]nce plaintiffs obtained and retained (for a year) comparable subsequent employment . . ., their damages from their termination from [the defendant] ceased.").

A position is substantially equivalent when it provides comparable status, pay, job responsibilities, working conditions, and promotional opportunities. *Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132, 1138 (5th Cir. 1988). "In considering whether substantially equivalent job opportunities are reasonably available, courts should first and foremost consider compensation." *Tudor v. Se. Oklahoma State Univ.*, 13 F.4th 1019, 1042 (10th Cir. 2021). Thus, higher-paying subsequent employment perforce ends an employment discrimination plaintiff's entitlement to back pay. *See, e.g.*, *Palasota*, 499 F.3d at 486. ("Certain events or circumstances may serve to cut off an employee's entitlement to back pay prior to the date of the judgment, such as, for example, the plaintiff's employment in a higher-paying job . . . ."); *Stephens v. C.I.T. Grp./Equip. Fin., Inc.*, 955 F.2d 1023, 1029 (5th Cir. 1992) ("[D]amages are 'settled and complete' and the back pay period ends, when the plaintiff begins earning more at his new job than he did at the job from which he was discharged."); *Kolb v. Goldring, Inc.*, 694 F.2d 869, 874 (1st Cir. 1982) (holding that the relevant period for calculation of back pay was the date of unlawful termination to the date plaintiff received a raise from subsequent employer and thus began earning more with his new employer); *Gaffney v. Riverboat Servs. of Indiana, Inc.*, 451 F.3d 424, 463 (7th Cir. 2006) ("[I]n the

context of Title VII, a plaintiff is eligible for back pay from the date of her injury to the date that she acquires a higher-paying job."); *Nordquist v. Uddeholm Corp.*, 615 F. Supp. 1191, 1204 (D. Conn. 1985) (holding that back pay is calculated from "the date of termination to the date of employment at equal or higher salary if the plaintiff was fortunate enough to obtain such employment prior to the date of trial"); *Watlington v. University of Puerto Rico*, 751 F. Supp. 318, 332 (D. Puerto Rico 1990) ("[D]amages for back pay cease when the plaintiff begins to earn higher wages than what he would have received from his previous job.").

Dykzeul accepted a full-time sales position as an account manager with Patient Care in October 2017. Dkt. 142, ¶ 23. The Patient Care position was higher-paying and substantially equivalent to the Charter DSR position in all material respects. Both were full-time sales positions. *Id*. As a DSR, Dykzeul would have been going door-to-door to residential homes selling cable, internet, and televisions services, and as an account manager with Patient Care Dykzeul traveled to various healthcare providers selling dialysis products to patients. *Id*.

The parties have stipulated that Dykzeul would have earned an annual base salary of $20,800 plus commissions and benefits had Charter hired her as a DSR in October 2015. SF No. 18. Patient Care paid Dykzeul an annual base salary of $70,000 plus commissions and benefits. Dkt. 142, ¶ 23. Dykzeul's annual base salary at Patient Care thus exceeded what her base salary would have been at Charter by $49,200.

In fact, Dykzeul's annual base salary at Patient Care exceeded what the total of her base salary plus benefits would have been under all three of Nutten's scenarios. As noted, Nutten estimates Dykzeul's lost Charter benefits as 17% of projected earnings. Dkt. 141, ¶ 6. Under his Scenario 1, his most generous, he assumes that Dykzeul would have earned $100,000 in total annual compensation (base salary plus commissions) at Charter and thus values lost benefits at $17,000 a year. *Id*. ¶¶ 13-14. Adding the highest annual value that Nutten assigns to lost

1  Charter benefits ($17,000) to what would have been Dykzeul's annual Charter base
2  salary ($20,800) is still $37,200 less than what just her annual base salary was at
3  Patient Care ($70,000).  TE 26, Sched. 2.  Thus, Dykzeul's fixed compensation at
4  Patient Care, which would her base salary and benefits, was significantly better at
5  Patient Care than what it would have been at Charter.

6           Because the account manager position with Patient Care was higher-paying
7  and in all other relevant respects substantially equivalent to the DSR position,
8  Dykzeul's entitlement to back pay ceased when she accepted the position with
9  Patient Care in October 2017.  As the Supreme Court has explained, "the
10 availability of [a] better job terminates the ongoing ill effects of the defendant's
11 refusal to hire the claimant. . . . continuing to hold [a defendant] responsible for
12 back pay after [an applicant] lost [a better] job [ ] would be to require, in effect, that
13 [the defendant] insure them against the risks of unemployment in a new and
14 independent undertaking.  Such a rule would not merely restore [applicants] to the
15 position where they would have been were it not for the unlawful discrimination[ ];
16 it would catapult them into a better position than they would have enjoyed in the
17 absence of discrimination.  *Ford Motor*, 458 U.S. at 234 (1982).

18          Dykzeul's right to back pay ended no later than October 31, 2017, because
19 "[o]nce [she] obtained and retained . . . comparable subsequent employment at
20 [Patient Care], [her] damages from [Charter's refusal to hire] ceased."  *Alexander*,
21 46 Cal. App. 5th at 267.  Accordingly, if the Court decides to use a back pay rate
22 higher than the average annual earnings for Turlock DSRs, Dykzeul's back pay
23 should be calculated by deducting her actual post-Charter earnings and benefits
24 (stipulated to by the parties) for the approximate 24.5-month period between
25 October 15, 2015, and October 31, 2017, from her estimated lost Charter earnings
26 and benefits for the same period.[12]

27 _____
28 [12] As discussed above, if the Court adopts Charter's method of estimating
   Dykzeul's los earnings and benefits, Dykzeul fully mitigated her economic losses in
   2017 and her back pay period would be October 15, 2015, through December 2016.

7.    *Dykzeul Failed To Exercise Reasonable Care To Maintain Substantially Equivalent Employment[13]*

Under both federal and California law, Dykzeul had a duty to mitigate any potential lost earnings she may have suffered because Charter did not hire her for the DSR position.  *Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1020 (9th Cir. 2000) (federal law); *Parker v. Twentieth Century–Fox Film Corp.*, 3 Cal.3d 176, 181–182 (1970) (California law).  That duty required her to exercise reasonable diligence to search for *and maintain* comparable employment.  *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 937 (5th Cir. 1996); *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1277 (4th Cir. 1985) ("[W]e are of the opinion the Title VII claimant must also use reasonable diligence to maintain any suitable employment which is secured."); *E.E.O.C. v. Delight Wholesale Co.*, 973 F.2d 664, 670 (8th Cir. 1992) ("A Title VII claimant has a duty to mitigate damages by exercising reasonable diligence to . . . maintain a suitable job once it is located.").  "Although the employer has the initial burden of proof regarding a [plaintiff's] failure to mitigate, the burden shifts to the [plaintiff] where comparable employment is found but later lost."  *Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 486 (5th Cir. 2007).

Dykzeul's employment with Patient Care was superior to the Charter DSR position because it was higher-paying and substantially equivalent in all other material respects.  She earned a significantly higher annual base salary with Patient Care ($70,000) than she would have as a DSR ($20,800), and both roles were full-time sales positions offering benefits and incentive-based compensation.

Patient Care terminated Dykzeul's employment effective as of April 30,

---

[13] Dykzeul misrepresents to the Court in her brief that "Charter stipulated that Dykzeul made reasonable efforts to mitigate her damages."  Dkt. 170, Pl.'s Br. at 18:21-19.  While Charter has stipulated that Dykzeul made reasonable efforts *to obtain* employment after she applied for the DSR position, *see* SF No. 19, it has consistently contended that she failed to exercise reasonable care to *maintain* comparable employment when she was terminated for cause by Patient Care.

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

2018.  Dkt. 158, 7/22/21 Trial Tr. at 19:23-20:14.  Although Dykzeul did her best to conceal the real reason why Patient Care terminated her employment, Seoane, Patient Care's HR Director, testified that Patient Care terminated Dykzeul's employment for performance reasons, which were documented contemporaneously by Dykzeul's supervisor.  Specifically, Dykzeul was terminated because of her lack of preparation and clinical and product knowledge.  Dkt. 165, TE 55, pp. 11-14; Dkt. 158, 7/22/21 Trial Tr. at 11:14-15:25.

A plaintiff fails to reasonably mitigate damages when she is involuntarily discharged from substantially equivalent or comparable employment due to misconduct or performance reasons.  *Johnson v. Spencer Press of Maine, Inc.*, 364 F.3d 368, 379 (1st Cir. 2004); *Brady*, 753 F.2d at 1277.  Thus, "[w]here the jury determines the employee was fired from a substantially similar position for cause, any amount the employee with reasonable effort could have earned by retaining that employment should be deducted from the amount of damages which otherwise would have been awarded to the employee . . . ."  *Stanchfield v. Hamer Toyota, Inc.*, 37 Cal. App. 4th 1495, 1502-03 (1995) (applying California law).

Dykzeul failed to mitigate her damages when Patient Care terminated her employment for cause.  Consequently, the Court should offset and deduct the amounts that Dykzeul would have earned had Patient Care not terminated her employment for cause from the date of her termination until such time she once again obtained substantially equivalent employment.  *Brady*, 753 F.2d at 1273; *Knickerbocker Plastics Co.*, 132 NLRB 1209, 1215 (1961).

Patient Care terminated Dykzeul's employment for performance related reasons effective April 30, 2018.  While employed by Patient Care, she received and annual base salary of $70,000 plus commissions and benefits.  She subsequently accepted a substantially equivalent sales position with Goldco in "the middle" of February 2019.  Therefore, for the period between May 1, 2018 and February 14, 2019 (9.5 months), Charter is entitled to a minimum offset of $55,417,

which represents Dykzeul's prorated earnings had Patient Care not terminated her employment.[14]

### 8.     Summary Of Back Pay Calculation

For the reasons discussed above, the Court should use the average annual earnings of all Turlock DSRs during the three-year period after Dykzeul's application to estimate the value of her lost Charter earnings and benefits and find that: (1) Dykzeul fully mitigated by 2017 when her actual compensation, including earnings and benefits, exceeded what her expected compensation would have been had Charter hired her in October 2015, *see supra* Section V.A.5; (2) the appropriate back pay period is October 2015 through December 2016; and (3) Dykzeul's total economic loss is no more than $22,259.

If the Court disagrees with Charter's approach and ultimately determines that a rate higher than the average annual earnings of all Turlock DSRs should be used to estimate Dykzeul's expected lost Charter earnings and benefits, the Court should find that the back pay period terminates no later than October 2017, when Dykzeul obtained a full-time sales position with Patient Care that was higher-paying and substantially equivalent to the Charter DSR position in all other material respects.

Finally, if for any reason the Court decides that a back pay period extending beyond October 2017 is appropriate, it should find that Charter is entitled to a minimum offset of $55,417 from any resulting backpay award, which represents her prorated Patient Care base salary for the period between May 1, 2018 (Patient Care date of termination), and February 14, 2019 (Goldco date of hire) (9.5 months).

### B.     The Court Should Deny Dykzeul's Request For Prejudgment Interest Because The Amount Of Her Damages Were Not Readily Ascertainable

Dykzeul asks the Court to award her prejudgment interest on her lost earnings and benefits.  Prejudgment interest in a Title VII case is discretionary. *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1446 (9th Cir. 1984).  "The

---

[14] $5,833 monthly base salary ($70,000/12) x 9.5 months = $55,413.

decision of whether to grant or deny prejudgment interest is dependent upon 'whether the amount of damages is easily ascertainable.' " *Donnelly v. Yellow Freight Systems, Inc.*, 874 F.2d 402, 411 (7th Cir. 1989); *Maksymchuk v. Frank*, 987 F.2d 1072, 1077 (4th Cir. 1993) ("Prejudgment interest is commonly denied when the back pay award is not readily determinable or when the plaintiff fails to raise the issue in a timely or an appropriate manner."). "The fact that the amount of backpay is not readily determinable weighs against awarding prejudgment interest." *Domingo v. New England Fish Co*., 727 F.2d 1429, 1446 (9th Cir. 1984). "Courts commonly decline to award pre-judgment interest when the back pay award is not readily determinable or when the plaintiff fails to raise the issue in a timely or appropriate manner." *Peinado v. S. Pac. Transp. Co.*, No. C-92-545 MHP, 1996 WL 449184, at *3 (N.D. Cal. July 31, 1996); *see also E.E.O.C. v. Accurate Mech. Contractors, Inc.*, 863 F. Supp. 828, 837 (E.D. Wis. 1994) (denying prejudgment interest where plaintiff's damages were not readily ascertainable; even though her hourly rate of pay was easily determined, "calculating the period for which she was entitled to backpay involved a subjective estimate as to the number of days that she would have worked for [defendant] at the Niagara job site absent the discriminatory conduct").

In *Domingo*, the district court denied a request for prejudgment interest in an employment discrimination case, where the employer provided room and board as part of its employees' compensation. 727 F.2d at 1446. The district court considered the difference between the quality of housing that the employer provided to "whites as opposed to nonwhites" to be a wage differential and awarded back pay after discussing and considering various subjective factors that affect the value of housing. *Ibid*. The Ninth Circuit affirmed the denial of prejudgment interest, finding that denial was warranted "[i]n view of the many subjective factors the court valued in determining the amount of damages." *Ibid*.

Here, Dykzeul acknowledges that "[i]t is admittedly challenging to assess

economic loss in a failure to hire case, especially such as this one, where the potential earnings are not fixed by salary, but variable based on sales commissions."  Dkt. 170, Pl.'s Br. at 39:21-23.  Because the primary component of Dykzeul's claim for back pay consists of incentive-based commissions, as her expert puts it, "it is impossible to know precisely how much Dykzeul would have earned had she been hired by Charter in 2015."  Dkt. 141, ¶ 9.  Dykzeul herself has presented the Court with three different projections of lost DSR earnings and benefits; two using speculative figures from a job description and one using a weighted average based on cherry-picked data.  The alleged economic losses under the three different scenarios vary widely, ranging from just over $425,000, to approximately $258,000, to approximately $145,000.  Which scenario should be chosen, according to Dykzeul, depends on whether the Court thinks she would have been a "top-tier" or average DSR.  As the foregoing demonstrates, the amount of damages in this case are not readily determinable and, based on Dykzeul's methodology, require subjective determinations of how successful she would have been as a DSR.  The Court should therefore deny Dykzeul's request for prejudgment interest on her Title VII claims.

Neither is Dykzeul entitled to prejudgment interest on her FEHA claims. Under California law, prejudgment interest is available if the recoverable damages are "certain, or capable of being made certain by calculation."  Cal. Civ. Code § 3287(a).  The standard for certainty under Section 3287(a) is "whether defendant actually knows the amount owed or from reasonably available information could ... have computed that amount."  *Roodenburg v. Pavestone Co., L.P.*, 171 Cal. App. 4th 185, 191 (2009) (internal citation and quotations omitted).  In other words, "[d]amages are deemed certain or capable of being made certain within the provisions of subdivision (a) of section 3287 *where there is essentially no dispute between the parties concerning the basis of computation of damages* if any are recoverable but where their dispute centers on the issue of liability giving rise to

damage." *Leff v. Gunter*, 33 Cal.3d 508, 189 (1983) (citation omitted) (emphasis added).

In *Navarro v. DHL Glob. Forwarding*, No. CV15-5510-CAS(EX), 2017 WL 11647704 (C.D. Cal. Dec. 22, 2017), applying California law, the court denied the prevailing plaintiff's request for prejudgment interest in a FEHA discrimination and wrongful termination case because the measure of the plaintiff's lost-wages was not "readily ascertainable" to the defendant on the date of plaintiff's termination since the plaintiff's "total compensation varied considerably from year to year because he did not have a guaranteed salary level." *Id*. at *2.

The same dilemma exists in this case.  Dykzeul never even worked as a DSR and had she been hired her total compensation would not have been fixed.  The parties heavily dispute how Dykzeul's lost Charter earnings and benefits should be computed.  Dykzeul herself presents the Court with three alternative methodologies and Charter a fourth.  Under the circumstances, there was no information that was reasonably available to Charter at the time of Dykzeul's non-hire from which it could calculate her damages.  Dykzeul, therefore, is not entitled to prejudgment interest under California law, either.[15]  *See Sagadin v. Ripper*, 175 Cal. App. 3d

---

[15] Dykzeul's expert includes prejudgment interest at a rate of 10% in his calculations of her economic losses under all three of his scenarios.  Although prejudgment interest should be denied, if the Court concludes otherwise it should not use the 10% rate that Dykzeul's expert assumes in his scenarios and Charter requests that the Court order supplemental briefing regarding the appropriate rate that should be used to calculate prejudgment interest.  Although Dykzeul does not address the issue of the appropriate prejudgment interest rate in her brief,  Charter notes that a 10% rate does not appear to be authorized under either federal or California law. *Compare Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 628 (9th Cir. 2007) ("Generally, the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest.") (internal quotation marks omitted), *with Bullock v. Philip Morris USA, Inc.*, 198 Cal. App. 4th 543, 573 (2011) ("Absent a statutory provision specifically governing the type of claim at issue, the prejudgment interest rate is 7 percent under article XV, section 1 of the California Constitution.").

1   1141, 1175-76 (1985) (trial court abused discretion in awarding prejudgment

2   interest where "the amount of the actual damages suffered . . . remained uncertain

3   until some factfinder determined them).

4   **C.     Dykzeul Did Not Suffer Any Serious Emotional Distress**

5       Dykzeul asks the Court to award her emotional distress damages "of at least

6   $500,000." But an award anywhere near that amount, on the facts of this case,

7   would be grossly excessive. *See, e.g.*, *Hetzel v. Cty. of Prince William*, 89 F.3d

8   169, 171-72 (4th Cir. 1996) (reversing an award of $500,000 for emotional distress

9   based almost entirely on the plaintiff's brief, conclusory, and self-serving testimony

10  concerning stress, headaches, trouble reading to her daughter, and problems with

11  her family life allegedly caused by the employer's actions as unsupported by the

12  "thin" evidence and excessive as a matter of law).

13      Dyzkeul did not seek or receive treatment from any medical providers for her

14  alleged emotional distress and has no diagnosed mental disorder or illness.  The

15  only evidence to support her exorbitant request is her uncorroborated self-serving

16  testimony that after her interview for the DSR position she: felt anxious and was

17  stressed about finances; worried that she might not find a full-time job again

18  because she "wanted to please God in keeping his Shabbat"; and felt withdrawn

19  because she had nobody to talk to.  Dykzeul also cites to the fact that she cried at

20  trial as evidence of her severe emotional distress.

21      Regarding Dykzeul's crying at trial, the point in the trial at which she cried

22  was when she claimed to the Court that she was distraught by Charter's decision

23  not to hire her because this was the first time anything like this had happened to her.

24  According to her, she had "never been rejected from a job based solely on my faith

25  and keeping Shabat for 24 hours.  Never.  That's never happened before." 7/21/21

26  Tr. at 293:17-21.  Yet, on cross-examination, Dykzeul admitted that she sued

27  another employer for discrimination and failure to accommodate her Sabbath

28  observance before her Charter application, although she unbelievably claimed not

1   to recall whether she had sought emotional distress damages in that case, too.

2   7/21/21 Tr. at 323:23-324:23.  Charter respectfully acknowledges that testifying in

3   court can be a stressful experience, and that not getting a job offer can feel bad, but

4   this was but one job interview and one position (among many, many others) that

5   she did not get.  Dykzeul's contention that not getting the DSR job offer caused her

6   $500,000 worth of emotional distress and to doubt she would ever work full-time

7   again appears greatly exaggerated.

8        Dykzeul also testified that she did not seek mental health treatment because

9   she couldn't afford it, but she has made high five and six figures since her interview

10  and has never even bothered to check how much it would have cost to see a mental

11  health professional.  Indeed, as of the trial in this action in July 2021 (nearly six

12  years after her interview), Dykzeul still has not sought treatment for her alleged

13  emotional distress, even though she made $150,000 in the first six months of 2021

14  alone.  Again, Dykzeul's claim that she suffered $500,000 worth of emotional

15  distress appears greatly exaggerated, when she was not even bothered enough to

16  seek professional help.

17        This case does not involve a long-time employee who was subjected to a

18  hostile work environment or unlawfully terminated.  Swift did not make any

19  derogatory or offensive remarks.  Dykzeul was a job applicant who did not get the

20  job she applied for because she could not work Saturdays when working Saturdays

21  was a job requirement, and not, as she suggests, because she believes in God or

22  observes the Sabbath.  Nor was she unemployed for an extended amount of time.

23  She found a part-time sales job within a couple of weeks of her interview with

24  Swift and a full-time sales job within five months.  Since then, she has had multiple

25  part- and full-time sales jobs, making high five and six figures.  Dykzeul has had no

26  problem finding work, and her assertion that she was worried she would never be

27  able to find a full-time job again lacks credibility.

28        In sum, Dykzeul's uncorroborated, self-serving, and dubious testimony does

not support a significant award for emotional distress.  If Dykzeul suffered emotional distress as a result of not getting the DSR job, it was the garden variety type that usually attends when one gets passed over for a job, and should be valued, if at all, in the thousands, not tens or hundreds of thousands, of dollars.

### D.    The Evidence Does Not Support An Award Of Punitive Damages

"Punitive damages are allowed in a Title VII action only under limited circumstances." *U.S. Equal Employment Opportunity Comm'n v. Consol Energy, Inc.*, 860 F.3d 131, 150 (4th Cir. 2017).  The relevant statutory provision permits the recovery of punitive damages only if an employer "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The Supreme Court has interpreted "reckless indifference" to mean "recklessness in its subjective form" – i.e., to be liable for punitive damages, "an employer must at least discriminate *in the face of a perceived risk* that its actions will violate federal law." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535-536, 119 S. Ct. 2118, 2124–25, 144 L. Ed. 2d 494 (1999) (emphasis added).

"In general, intentional discrimination is enough to establish punitive damages liability." *Passantino v. Johnson & Johnson Consumer Prod., Inc.*, 212 F.3d 493, 515 (9th Cir. 2000).  But the Supreme Court stated in *Kolstad* that "[t]here will be circumstances where intentional discrimination does not give rise to punitive damages liability":

> In some instances, the employer may simply be unaware of the relevant federal prohibition. There will be cases, moreover, in which the employer discriminates with the distinct belief that its discrimination is lawful. The underlying theory of discrimination may be novel or otherwise poorly recognized, or an employer may reasonably believe that its discrimination satisfies a bona fide occupational qualification defense *or other statutory exception to liability*.

*Kolstad*, 527 U.S. at 536-37 (emphasis added); *Passantino*, 212 F.3d at 515 (citing

1   *Kolstad*).

2          "Common to all of these exceptions is that they occur when the employer is

3   aware of the specific discriminatory conduct at issue, but nonetheless reasonably

4   believes that conduct is lawful.  Under such circumstances, an employer may not be

5   liable for punitive damages." *Passantino*, 212 F.3d at 515.

6          There is no evidence in this case that Swift's decision not to hire Dykzeul

7   was motivated by ill will or discriminatory intent.  Nor is there any evidence from

8   which it can be inferred that Swift made his decision "in the face of a perceived

9   risk" that it would violate federal laws.  To the contrary, it is undisputed that Swift

10  *wanted* to hire Dykzeul, and the evidence at trial shows that he earnestly considered

11  whether he could accommodate Dykzeul's request to work Sundays instead of

12  Saturdays.  Though Swift eventually concluded that he could not do so because it

13  would be too much for him to work seven days a week with no days off, he did so

14  because he believed that the negative impact on his own work schedule would be

15  too great to bear.

16         In *Kolstad*, the Supreme Court stated that punitive damages are inappropriate

17  when an employer reasonably believes that a "statutory exception" to liability may

18  apply.  527 U.S. at 536-37.  Undue hardship is a statutory defense to liability for

19  failure to accommodate religious beliefs and the Ninth Circuit, since *Hardison*, has

20  repeatedly held that undue hardship may be shown through a more than de minimis

21  impact on coworkers.  *Bhatia*, 734 F.2d at 1384; *Balint*, 180 F.3d at 1054.  Here,

22  Swift genuinely considered Dykzeul's request to work Sundays instead of

23  Saturdays and made a good faith determination that accommodating her request

24  would cause too much of a burden on his own work schedule.  Indeed, the Court

25  specifically held in its summary judgment order that a jury could reasonably

26  conclude on the facts of this case that the additional burdens on Swift amount to an

27  undue hardship.  Dkt. 64 at p. 12.  If a jury (or in this case the Court) can

28  reasonably conclude that the additional burdens imposed on Swift constitute undue

hardship, Swift's conclusion to that effect must necessarily have been reasonable. When, as here, there is no evidence of religious hostility or discriminatory intent and a manager comes to a reasonable – even if the Court determines incorrect – belief that the impact of a particular accommodation would result in undue hardship, punitive damages are improper.  *See Passantino*, 212 F.3d at 515; *Sturgill v. United Parcel Serv., Inc.*, 512 F.3d 1024, 1035-36 (8th Cir. 2008) (reversing award of punitive damages in religious accommodation case even though the jury reasonably found that UPS failed to reasonably accommodate the plaintiff's religion, where "[n]o UPS employee was shown to have acted with malice or reckless indifference" to the plaintiff's accommodation request); *Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*, 439 F.3d 894, 904 (8th Cir. 2006) (visually impaired route driver discharged due to safety concerns did not establish that employer acted with malice necessary to sustain award of punitive damages); *Praseuth v. Rubbermaid, Inc.*, 406 F.3d 1245, 1254-55 (10th Cir. 2005) (punitive damage claim properly denied in a disability accommodation case where there was no evidence that employer acted in bad faith or with malice in discharging plaintiff, even though jury determined that this disability could reasonably have been accommodated).

In sum, Swift did not intentionally discriminate against Dykzeul and there is no evidence – certainly no clear and convincing evidence – he knew or perceived a risk that denying Dykzeul's requested accommodation because of the burden it would have on his own work schedule would constitute a violation of federal law. Swift did not act with malice or reckless indifference to Dykzeul's rights and punitive damages are inappropriate in this case.

Finally, even if Swift acted with the requisite malice or reckless indifference in deciding not to hire Dykzeul, *which he did not*, there is still no basis to award punitive damages against *Charter*.  To justify an award of punitive damages against an employer, "[t]he plaintiff must impute liability" to the company, and "an

employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's 'good-faith efforts to comply with Title VII.' " *Kolstad*, 527 U.S. at 539, 545. Thus, employers "may now establish an affirmative defense to punitive damages liability when they have a bona fide policy against discrimination[.]" *Passantino*, 212 F.3d at 516.  The Ninth Circuit has explained that "*Kolstad* provided the employer with a new 'good faith' defense, enabling it to escape punitive damages if it can show that the challenged actions were not taken by senior managers and were contrary to the employer's good faith implementation of an effective antidiscrimination policy." *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 864 (9th Cir. 2002), *aff'd*, 539 U.S. 90, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003).

While punitive damages may be awarded despite the existence of an employer's bona fide anti-discrimination policy if a plaintiff can show that the employer failed to enforce the policy, *Bains LLC v. Arco Prod. Co., Div. of Atl. Richfield Co.*, 405 F.3d 764, 774 (9th Cir. 2005), here the record is devoid of any evidence that Charter failed to enforce its anti-discrimination policy.  The evidence in the record establishes that Charter had a bona fide anti-discrimination policy and that Charter provided anti-discrimination training to its supervisors, including Swift.  *See* TE 31; TE 34.  Dykzeul did not complain to Charter's human resources after her interview about possible discrimination; there is no evidence that someone in a position to enforce the company's anti-discrimination policy, like senior managers or human resources personnel, ignored or abdicated their duties to enforce the anti-discrimination policy; and there is no evidence that complaints of discrimination made by others were ignored or improperly addressed.  In the absence of any evidence that Charter failed to enforce or implement its anti-discrimination policy, Charter has met its burden to establish that it had a formal anti-discrimination policy and that it made good faith efforts to comply with Title VII.  Punitive damages are therefore improper in this case, even assuming Swift

acted with the requisite malice or reckless indifference, which he did not.

## VI.   **CONCLUSION**

The preponderance of the evidence at trial establishes that Charter could not have accommodated Dykzeul's unavailability to work Saturdays without incurring undue hardship, and that Charter did not intentionally discriminate against Dykzeul because of her religion when it decided not to hire her for the DSR position. Judgment on Dykzeul's religious accommodation and intentional discrimination claims under Title VII and the FEHA should therefore be entered against her and in favor of Charter.

Dated:  January 28, 2022                    MORGAN, LEWIS & BOCKIUS LLP


By:    _/s/ Samson C. Huang_
       Christopher J. Banks
       Samson C. Huang
       Attorneys for Defendant
       CHARTER COMMUNICATIONS, INC.