**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

---

TERESA DYKZEUL,
      Plaintiff,

          v.

CHARTER COMMUNICATIONS,
INC.,
      Defendant.

CV 18-5826 DSF (GJSx)

Findings of Fact and Conclusions
of Law After Court Trial

---

     This matter was tried to the Court on July 20, 2021.  Having
heard and reviewed the evidence and having considered the parties'
post-trial submissions, and having observed the credibility of the
witnesses, the Court makes the following findings of fact and
conclusions of law.

## I. FINDINGS OF FACT[1]

**A.    The Parties**

     1.    Defendant Charter Communications, Inc. provides cable
television, internet, and television services.  <u>See</u> Stipulated Facts ¶ 2
(SF), dkt. 137.

---

[1]  Any finding of fact deemed to be a conclusion of law is incorporated into the
conclusions of law.  Any conclusion of law deemed to be a finding of fact is
incorporated into the findings of fact.

2.      During the relevant time period, Charter provided these services in Gilroy, Turlock, and San Luis Obispo, California.  See id. ¶ 6.

3.      One of the ways Charter sold these services to customers was through door-to-door Direct Sales Representatives (DSRs).  Id. ¶ 2.

4.      Plaintiff Teresa Dykzeul was at all relevant times a follower of the Messianic Christian faith.  Dykzeul Decl. ¶ 3, dkt. 142.

5.      As part of her sincerely held religious beliefs, Dykzeul observes the Sabbath and cannot work during it, or from Friday at sundown to Saturday at sundown.  Id. ¶¶ 2–4; SF ¶¶ 10–11.

**B.      Plaintiff's DSR Employment Application**

6.      Dykzeul applied to be a DSR with Charter in October 2015. Id. ¶ 1.  The application asked if she was able to work evenings and weekends, and she indicated she could.  Id. ¶ 3.

7.      On October 15, 2015, Dykzeul interviewed for the DSR position with Jim Swift.  SF ¶ 5.  Swift was a Direct Sales Supervisor for Charter over Gilroy, Turlock, and San Luis Obispo. Id. ¶ 6.

8.      During the October 15 interview, Swift told Dykzeul that the availability to work Saturdays was a requirement for the DSR position.  SF ¶ 7.

9.      Dykzeul then told Swift she could not work Friday nights and Saturday mornings and afternoons due to her observance of the Sabbath.  Swift understood that this was because of her religion.  SF ¶¶ 10–11.

10.      After being told that DSRs were required to work on Saturdays, Dykzeul offered to work on Sundays instead. SF ¶ 12.

11.     Swift wanted to hire Dykzeul because he thought she had potential but concluded she could not work Sundays instead of Saturdays because then he would have to work seven days a week. SF ¶¶ 13–14.  Swift therefore chose not to hire Dykzeul for a DSR position with Charter.  Id. ¶¶ 15–16.

12.     The only reason Swift did not hire Dykzeul was that she could not work on Saturdays.  SF ¶ 17.

## II. CONCLUSIONS OF LAW

### *Plaintiff's Claims*

13.     Dykzeul brings four separate claims for religious or intentional discrimination and failure to accommodate religious beliefs, two under federal law (Title VII), and two under California law (Fair Employment and Housing Act (FEHA)).

14.     Charter argues that Dykzeul's claims under Title VII for intentional discrimination and failure to accommodate are simply different theories supporting a single claim under Title VII for disparate impact. But even assuming Charter is correct, it has not identified any meaningful change that could occur as a result of the decision it requests. The Court is also not aware of any significance the decision would have to either party, the relief available to Dykzeul under Title VII, or the element of any claim or defense in this case, particularly because FEHA already required Dykzeul to bring two separate claims.  The Court therefore declines to issue the requested advisory opinion.

### *Failure to Accommodate*

15.     For Dykzeul's claim under Title VII for disparate treatment for failure to accommodate her religious beliefs the elements are:

   a. The employee had a bona fide religious belief, the practice of which conflicts with an employment duty;

   b. She informed her employer of the belief and conflict; and

    c. The employer discharged, threatened, or otherwise subjected her to an adverse employment action because of her inability to fulfill the job requirement.

    <u>Heller v. EBB Auto. Co.</u>, 8 F.3d 1433, 1438 (9th Cir. 1993).

16. For Dykzeul's claim under FEHA for failure to accommodate her religious beliefs, Gov. Code § 12940(l) (PTC at 7), the elements are:

    a. That Charter was an employer;

    b. That Dykzeul applied to Charter for a job;

    c. That Dykzeul had a sincerely held religious belief that required her to observe the Sabbath from sundown Friday to sundown Saturday;

    d. That Dykzeul's religious observance of the Sabbath conflicted with a job requirement;

    e. That Charter knew of the conflict between Dykzeul's religious observance and the job requirement;

    f. That Charter did not reasonably accommodate Dykzeul's religious observance;

    g. That Dykzeul's inability to comply with the conflicting job requirement was a substantial motivating reason for Charter's decision not to hire her;

    h. That Dykzeul was harmed; and

    i. That Charter's failure to reasonably accommodate Dykzeul's religious observance was a substantial factor in causing her harm.

17. Dykzeul has established each of the elements of her claims against Charter for failure to accommodate her religious beliefs under FEHA and Title VII.

4

### *Intentional Discrimination Under FEHA*

18.    For Dykzeul's claim for intentional discrimination under FEHA, the only disputed element is whether Dykzeul's religious practice/observance was a substantial motivating reason in Charter's decision not to hire her.

19.    Under FEHA, religion is broadly defined and includes "all aspects of religious belief, observance, and practice." Gov't Code § 12926(q). Sabbath is a religious observance or practice within the meaning of FEHA.

20.    Charter repeatedly argues that it cannot have intentionally discriminated against Dykzeul because there is no evidence of discriminatory animus, hostility, or intent because the parties have stipulated that the only reason she was not hired was that she could not work on Saturdays. Def. Tr. Br. at 36 (citing SF ¶ 17). Charter is incorrect.

21.    Religious discrimination under FEHA does not require discriminatory animus or hostility. <u>California Fair Employment & Housing Comm'n v. Gemini Aluminum Corp.</u>, 122 Cal. App. 4th 1004, 1011 (2004) (stating that the elements of a prima facie case for religious creed discrimination are "the employee sincerely held a religious belief; the employer was aware of that belief; and the belief conflicted with an employment requirement.")

22.    Charter has stipulated to facts sufficient to establish it committed intentional religious discrimination in violation of FEHA, and that the sole reason it did not hire Dykzeul was religion as it is defined in FEHA. <u>See</u> Gov't Code § 12926(q). Those stipulated facts are: Swift was the only person who made Charter's decision not to hire her; Swift knew she could not work on Saturdays because of her observance of Sabbath that was a part of her religion; and the only reason Swift did not hire her was that she could not work on Saturdays. SF ¶¶ 10-11, 15-17.

### *Defendant's Defenses*

23.    Charter has asserted defenses under both Title VII and FEHA for undue hardship and Plaintiff's failure to mitigate her damages.[2]  Charter must prove each of its defenses by a preponderance of the evidence.

24.    Plaintiff proposed the following accommodations that Charter could adopt to avoid discriminating against her because she observed Sabbath.  These proposed accommodations are relevant to Plaintiff's claim for failure to accommodate, as well as Defendant's undue hardship defense.

   a.  Excusing her from working Saturdays altogether and adjusting her performance goals according to a reduced schedule;

   b.  Allowing her to work longer hours on weekdays;

   c.  Allowing her to use vacation time or sick leave for her missed Saturdays; and

   d.  Using or hiring another DSR to cover her assigned leads on Saturdays.

***Undue Hardship***

25.    To establish an undue hardship defense under Title VII:

   a.  Charter must establish that all of Plaintiff's proposed accommodations would cause undue hardship;

   b.  "[A]n accommodation causes 'undue hardship' whenever that accommodation results in 'more than a de minimis cost' to the employer."  Ansonia Bd. of Educ. v. Philbrook,

---

[2] The Court declined to rule on Dykzeul's Motion *in limine* barring Charter from offering a mixed motive/same decision defense.  Order on MILs at 11, dkt 11.  The Court instead gave Charter a deadline to submit a written offer of proof on the factual and legal basis for its assertion of this defense, which Charter failed to provide.  Charter therefore finds against Charter as to this defense.

479 U.S. 60, 67 (1986) (quoting <u>Trans World Airlines, Inc. v. Hardison</u>, 432 U.S. 63, 84 (1977)).  "[A]dditional costs in the form of lost efficiency or higher wages may constitute undue hardships," as will accommodations that impose a "significant discriminatory impact on the plaintiff's coworkers."  <u>Opuku-Boateng v. State of Cal.</u>, 95 F.3d 1461, 1468 n.11, 12 (9th Cir. 1996).

c.  However, the Ninth Circuit is skeptical of "'hypothetical hardships' based on assumptions about accommodations which have never been put into practice."  <u>Anderson v. General Dynamics Convair Aerospace Div.</u>, 589 F.2d 397, 402 (9th Cir. 1978).

26.  To establish an undue hardship defense under FEHA, Cal. Gov't Code § 12926(u) requires Charter to show the possible accommodations were difficult or expensive, in light of:

a.  The nature and cost of the accommodation;

b.  Charter's ability to pay for the accommodation;

c.  The type of operations conducted at the facility;

d.  The impact on the operations of the facility;

e.  The number of Charter's employees and the relationship of the employees' duties to one another;

f.  The number, type, and location of Charter's facilities; and

g.  The administrative and financial relationship of the facilities to one another.

27.  Charter has failed to establish by a preponderance of the evidence that it would have been an undue hardship to accommodate Dykzeul's observance of Sabbath under either Title VII or FEHA.

28.  There was no meaningful requirement for DSRs to work Saturdays.  In October 2015, Swift knew he had no way of enforcing

his requirement to work on Saturdays.  He could not discipline a DSR, issue corrective action, or count it towards their vacation if a DSR did not work on Saturdays.  Trial Tr. July 20 at 163.  The tracking software Charter used did not display which day of the week sales were made and did not count weekends as sales days.  Day 1 Tr. 165–68.  Working on Saturdays is best viewed as a buffer day to be able to help meet sales targets in the event of cancellations, but unimportant if the DSR is otherwise meeting targets.  Id. at 167, 169.  The testimony from multiple DSRs shows that Saturdays were not a regular part of the work week.  Krystyna Amaral testified that Swift told her working on Saturdays was encouraged but it was not anywhere in company policy.  Trial Tr. July 20 at 99 (Amaral).  Daniel Blond also testified that Swift told him that working Saturdays had never actually been a requirement.  Id. at 62 (Blond).  Swift also knew any requirement to work on Saturdays was unenforceable when he decided not to hire Dykzeul.  Trial Tr. July 20 at 175–76 (Swift).  Indeed, there was a paucity of contemporaneous evidence that actually showed the existence and application of this alleged policy that had supposedly been in place for many years.

29.    Swift never meaningfully considered any alternatives besides having Dykzeul work additional hours on Sunday.  He never contacted supervisors in other regions or his own supervisors, or reviewed Charter's policies, procedures, or any other document.  Trial Tr. July 20 at 80.  Swift explained that he would have had to work every Sunday if he hired Dykzeul and allowed her to work on Sundays instead of Saturdays, but this was an assumption on his part and one the Court does not find credibly establishes any undue hardship.  Swift never attempted to discuss the matter with anyone else including his superiors, verify this assumption was accurate, or evaluate the feasibility of any alternative practices that would not require him to be on call every Sunday.

### *Mitigation of Damages*

30.     In order for Charter to establish a defense under FEHA that Dykzeul failed to mitigate her damages, Charter must show:

    a.  That employment substantially similar to the job Dykzeul applied for was available to her;

    b.  That Dykzeul failed to make reasonable efforts to seek and retain this employment; and

    c.  The amount Dykzeul could have earned from this employment.

31.     In order for Charter to establish a defense under Title VII that Dykzeul failed to mitigate her damages, Charter must show that Dykzeul failed to exercise "reasonable diligence" as required by statute.  42 U.S.C. § 2000e–5(g)(1).

32.     Dykzeul made reasonable efforts to obtain employment after her application for employment with Charter.  SF ¶ 19.  The only dispute between the parties on this defense is whether Dykzeul breached her obligation to make reasonable efforts to *maintain* similar employment (thus reducing the amount of back pay owed) due to the nature of her separation from Patient Care America in April 2018.  Given the Court's finding below that Dykzeul is entitled to only six months of backpay, the application of this defense is moot.

### *Damages*

33.     In actions for harassment under FEHA, "the plaintiff may recover those damages generally available in noncontractual actions."  State Dep't of Health Servs. v. Superior Ct., 31 Cal. 4th 1026, 1042 (2003) (quotation marks omitted).  Specifically, a court "may award unlimited compensatory and punitive damages."  Murillo v. Rite Stuff Foods, Inc., 65 Cal. App. 4th 833, 842 (1998).  A plaintiff may be awarded compensatory damages for emotional distress brought on by an employer's FEHA violations.  See Taylor v. Trees, Inc., 58 F. Supp. 3d 1092, 1103 (E.D. Cal. 2014) (citing Peralta Cmty. Coll. Dist. v. Fair Emp. & Hous. Comm'n, 52 Cal. 3d

40, 48 (1990)).  "Emotional distress [refers to] the full gamut of intangible mental suffering, including not only physical pain, but also fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal."  <u>Peralta</u>, 52 Cal. 3d at 48 n.4.  To recover compensatory damages for emotional distress, "there is no requirement that the 'emotional distress' be severe."  <u>Taylor</u>, 58 F. Supp. 3d at 1103.

### *Back-Pay*

34.    Congress's purposes in enacting Title VII were to eradicate discriminatory employment practices and "to make persons whole for injuries suffered on account of unlawful employment discrimination."  <u>Albemarle Paper Co. v. Moody</u>, 422 U.S. 405, 415, 418 (1975).  Congress vested the courts with wide discretion so they could provide 'make whole' or 'complete' relief, including back pay.  <u>Id.</u> at 420–21.  Given the purposes of Title VII, the Supreme Court has explained that once there has been a finding of unlawful discrimination backpay should be denied only for reasons that would not "frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination."  <u>Id.</u> at 420.  The parties do not dispute that if Charter violated Title VII, Dykzeul is owed backpay – only the amount is disputed.

35.    The variables needed to calculate the amount of backpay Charter owes Dykzeul are: (1) the appropriate rate of pay, (2) the length of time she is entitled to receive backpay, (3) and by how much that amount must be reduced or offset by the amounts Dykzeul actually earned during the period of backpay as required by Title VII and FEHA.

36.    At trial the parties presented their back pay calculations through experts.  Much of the expert testimony simply regurgitated the positions and assumptions of the parties and was not helpful to the Court.  The actual data and their discussions on DSR salaries and length of employment, however, was more helpful to the Court

both in making its calculations as well as understanding the nature
of the position.

    a.   Dykzeul's expert on backpay and damages was Wesley L.
Nutten.  Dkt. 141.  He provided three different calculations
of the backpay owed based on different models for DSR
income.  The first model assumed the highest DSR incomes
and was based on salaries Charter advertised in its
descriptions and other promotions for the job.  It assumed
Dykzeul's initial salary would be $100,000 and she would
be very successful in the job so it would only go up from
there, ending in $425,530.72 of owed backpay.  Nutten's
second model starts her salary at $75,000 and assumes she
is a little less successful, concluding that she would
ultimately be owed only $258,062.29 in backpay.  His third
model, based on data provided by Charter that he felt was
heavily flawed, has her salary starting at $57,349 and
Dykzeul finally being owed $145,914.64 in backpay.

    b.   Charter's expert on backpay and damages was Amy M.
Aukstikalnis.  Dkts. 145, 173.  She estimated Dykzeul's
salary based on the twenty-nine salaries of the DSRs who
worked in Turlock between October 2015 and October 2018,
and who she calculated had an average salary over that
period of $35,577.  She noted their median salary was
$31,768 over the three years, and only one DSR at the time
averaged more than $75,000.  She also testified that DSRs
had incredibly high turnover, and that 73.3% of them
during that period left the job within nine months. Dkt. 145
¶ 18.

Rate of Pay

37.    The appropriate figure for computing backpay owed to
Dykzeul must be based on the actual amount DSRs were earning at
the time Dykzeul would have been working there.  Plaintiff argues
that Charter should be held to advertisements representing higher

average salaries, but those representations have no nexus with the past discrimination Dykzeul faced and would be a windfall with no relation to providing "complete justice" for the effects of past or future discrimination.  <u>Clemens v. Centurylink Inc.</u>, 874 F.3d 1113, 1116 (9th Cir. 2017) (quotation and citation omitted)

38.   The average income for DSRs in the Turlock region over the three-year period starting October 2015 was $35,577. Aukstikalnis Decl. ¶ 8, dkt. 173–1.  In addition, for 2016, a DSR would have received $5,306 in benefits and $1,067 from a matching 401(k) contribution.  <u>Id.</u> at Ex. 8, p.11.  This means an average DSR's total compensation for one year would have been $41,950, or $20,975 for six months.  The Court finds the average compensation of a DSR provides an appropriate comparison based on Dykzeul's background, skills, and experience at that time.  While Dykzeul had some prior sales experience, she had virtually no experience selling door-to-door or with products and services like these, and she had relocated to the local area relatively recently.  The Court did not find Dykzeul's estimation of her own abilities to be applicable to the DSR position.

39.   Estimates that DSR salaries of $100,000 were achievable are not credible.  Only a single DSR in Turlock averaged over $75,000 during that period.  It is clear the salaries DSRs were actually achieving are far, far below those Plaintiff hoped for when applying and assumed as attainable by her expert.

<u>Duration of Backpay</u>

40.   The general rule in the Ninth Circuit is that backpay should be awarded "until the harm is fully remedied" and "absent 'compelling circumstances'" should be calculated from "from the date of the discriminatory act until the date of the final judgment." <u>Kraszweski v. State Farm Gen. Ins. Co.</u>, 912 F.2d 1182, 1184, 1185 n.2 (9th Cir. 1990) (quotation omitted).

41.   Courts have recognized the duration of backpay can be shortened based on circumstances showing the plaintiff is no longer

suffering a harm from discrimination or if the harm has been fully remedied.  "A claimant ceases to suffer damages when the employer offers him the job he sought or when he becomes unqualified to hold the position or is no longer willing to accept it." Id. at 1185 n.2. Similarly, the period of backpay may end because of the plaintiff's own actions if they demonstrate that her losses were caused by her own willful conduct or could not otherwise be attributed to discrimination, such as when an employee voluntarily quits alternative employment or decides to leave the labor market entirely. Sangster v. United Air Lines, Inc., 633 F.2d 864, 868 (9th Cir. 1980).

42.     The parties agree that the backpay period commences with Dykzeul's job interview in October 2015.  However, they disagree on the end date because their experts reach different conclusions on how much she would have earned had she been hired by Charter, how long it would have taken her to actually earn that amount and therefore fully mitigated her damages, and whether any other events prematurely terminate her right to backpay from Charter by establishing a different cause for her subsequent damages.

43.     Dykzeul's expert concludes she is owed backpay until the end of 2019 when she is hired by Goldco and her income has fully mitigated the damages she suffered due to Charter's discrimination. It takes until 2019 for this to occur because her expert concludes she would have been the most successful DSR in the region and would have received a salary significantly higher than that of her peers. Charter's own expert provides three different dates for when Dykzeul is no longer entitled to backpay based on different DSR income estimates and when she is allegedly terminated for cause by Patient Care America.  The Court ultimately finds none of the experts' calculations or factual scenarios meaningfully helpful in determining how long Dykzeul is entitled to receive backpay.

44.     Dykzeul's primary requirement for a job was a commission structure where she could achieve a six-figure income.  Trial Tr. July 21 at 279–280.  Besides her testimony, this is also the

conclusion drawn by her own expert and confirmed by her
subsequent job history showing she continued applying for and
working at multiple sales jobs until she found one where she could
excel, which she ultimately did at Goldco in February 2018.

45.     The Court finds that, had she been hired as a DSR, she
would have quickly (and accurately) realized that Charter's salary
predictions were virtually impossible to achieve, and she would not
have stayed as long as the 73.3% of the DSRs in Turlock who left
Charter within nine months of being hired.  Dkt. 145 ¶ 18.

46.     Therefore, even if Dykzeul had been hired by Charter she
would have continued looking for a high-paying sales job, and she
would have similarly concluded that to do so she needed to move to
Los Angeles.  The Court also concludes that even if Dykzeul had
been hired by Charter she still would have moved to Los Angeles
roughly six months later, which coincides with when she actually
started her position in Los Angeles with Heartland.  In essence, the
evidence establishes that obtaining the DSR position with Charter,
with its actual compensation instead of the unrealistic and
unobtainable figures Charter advertised, would not have
meaningfully changed Dykzeul's long-term plans.  Similarly, even if
Charter had changed its position and later offered Dykzeul the DSR
position, once she moved to Los Angeles she never would have
accepted an offer to move back to sell Charter equipment door-to-
door in Turlock.

47.     Because (1) Dykzeul would have held the DSR position for
only six months, and (2) had Charter offered her the DSR position
more than six months after her interview she would not have
accepted it, Dykzeul is entitled to six months of backpay in order to
make her whole for her injuries caused by Charter's discriminatory
conduct.  See Kraszweski, 912 F.2d at 1185 n.2 ("A claimant ceases
to suffer damages when . . . no longer willing to accept [the
position]").

Offset/Backpay

14

48.    The Court has already concluded above that Dykzeul would have left Charter and Modesto in March-April 2016 approximately six months after her interview with Charter.  This means that her backpay must be offset only with the income she received from AppStar, where she worked until March 2016.  In 2015 she earned $2,823 in income from AppStar, and in January through March of 2016 she earned an additional $7,865.17.  SF ¶¶ 20–21.  Combining these figures, Dykzeul earned a total of $10,688.17 in income that must be offset from the backpay she receives from Charter.

49.    Dykzeul argues for the first time in her Closing Reply Brief that this income from AppStar need not be offset under California law based on <u>Villacorta v. Cemex Cement, Inc.</u>, 221 Cal. App. 4th 1425 (2013).  Pl. Closing Reply Br. at 39.  The Court declines to address a legal argument apparently raised for the first time at the last possible opportunity.  The Court also notes a split of authority among California appellate courts, with the opinion in <u>Martinez v. Rite Aid Corp.</u>, 63 Cal. App. 5th 958, 969 (2021), expressly disagreeing.  Moreover, even Dykzeul's own expert offset all of the income she actually earned.  Dkt. 141 ¶ 5.

<u>Total Backpay Owed</u>

50.    For the six months she would have worked at Charter as a DSR in Turlock Dykzeul would have earned $20,975 in total compensation, which must be offset by the $10,688.17 she actually earned during that period from working for AppStar.  Dykzeul is therefore entitled to the difference of $10,286.83 as an award of backpay from Charter for its violations of FEHA and Title VII for its intentional religious discrimination as well as failure to accommodate her religious practices.

51.    As part of Plaintiff's backpay, she may also be entitled to prejudgment interest.  <u>Loeffler v. Frank</u>, 486 U.S. 549, 557 (1988) ("Title VII authorizes prejudgment interest as part of the backpay remedy in suits against private employers.").

52.    To avoid further disputes and unnecessary calculations, backpay shall be calculated on the total amount as if it were due on April 1, 2016, to be paid at the 7% per annum default rate set by California Constitution.  See Cal. Const., art. XV, § 1.

### *Emotional Distress*

53.    Dykzeul seeks $500,000 for damages from the emotional distress caused by Charter's conduct.  Dykzeul never saw a mental health professional with respect to her alleged emotional distress in this case and the only evidence introduced at trial to support the existence of her emotional distress was her own testimony.  In essence, she seeks damages for emotional distress based on two categories, the emotional distress she suffered from Defendant's unlawful conduct, and the emotional distress she suffered in her own life that would have been avoided had Defendant hired her. Plaintiff describes all these as compensable as "make-whole emotional distress damages."  Pl. Closing Br. at 41. Plaintiff does not provide any legal authority supporting the recovery of each item of damages based on the testimony she cites in her Closing Brief. More substantively, virtually all of the pieces of evidence that Plaintiff argues entitle her to "an award for emotional damages of at least $500,000" consist of Plaintiff merely pointing to the transcript every time she said something was distressing or became emotional. Plaintiff does not satisfy her burden of establishing the existence of compensable damages caused by Charter's wrongful conduct through scattershot and unexplained citations to the trial transcript. The Court therefore concludes that Plaintiff has not established she is entitled to damages for emotional distress based on the legal arguments and evidence presented at trial.

54.    In any event, Plaintiff's testimony regarding the emotional distress she allegedly experienced when she was not hired was not credible.  Among other things, Plaintiff indignantly testified that although she had interviewed for positions and not been hired before, this was different and caused compensable emotional distress, claiming: "I've never been rejected from a job based solely

on my faith and keeping Sabbath for 24 hours.  Never.  That's never happened to me before."  Trial Tr. July 21 at 293:19-21.  However, after being confronted on cross-examination with a previous lawsuit she filed, Plaintiff became defensive until she eventually admitted she had sued a previous employer for failure to accommodate her Sabbath observance when working on the weekends had not been mentioned during that interview.  Trial Tr. July 21 at 323:23-324:23.  Dykzeul's indignant denials that this had never happened to her before may have been technically correct because the previous discrimination occurred once she was an employee and therefore after she was hired.  But this distinction has no significance to Dykzeul's harm or emotional distress and instead came across more like a lawyer making the best argument available and not a genuine expression of emotional distress because of religious discrimination.  More significantly, it provides even further reasons for the Court's skepticism of her testimony where it lacks any meaningful corroboration.

55.    Plaintiff's second theory of emotional distress damages is for emotional distress she experienced from her personal life that she concludes would have been avoided had Charter hired her.  This includes (1) financial distress as a newly divorced woman burning through her savings while trying to find a job, (2) stress and anxiety from a health condition treated with expensive medication that requires her to have a job that provides health insurance, and (3) emotional distress from moving in with her family – who did not share her challenges or her faith – and then having to leave that support system behind to move to Southern California because she could not find a job in Modesto.  Pl. Closing Br. at 42–43.

56.    Plaintiff provides no explanation or authority suggesting any of these are compensable as emotional distress damages under FEHA or Title VII, and the Court declines to look for authority on its own initiative, particularly because Plaintiff does not establish any of these issues would have been avoided had Charter hired Plaintiff as a DSR.  Plaintiff has unreasonably concluded that being hired by

17

Charter as a DSR can eliminate financial stress and prevent family
members from causing stress to each other.

57.    Charter's decision not to hire Dykzeul did not cause her
compensable financial stress.  Dykzeul was asked if it caused an
emotional impact and she testified: "Well, yes, it did of course.  I was
very stressed financially because I have, like I've mentioned, I have
a strong work ethic." Trial Tr. July 21at 292:12–16.  It is unclear
what fact she thinks this testimony established or why she thinks it
is sufficient to support a claim for damages due to emotional
distress, because nothing in the language she quotes suggests
anything beyond her ordinary levels of stress that she testified she
had been feeling since her divorce five years earlier in 2011.

58.    Dykzeul's conflicting testimony is also insufficient to
establish she experienced compensable financial distress.  She
testified that she was "very stressed financially" after not getting
the job at Charter.  Trial Tr. July 21 at 292:12–16.  But she also
testified that she had already been experiencing considerable
financial stress from her divorce and dwindling savings which dates
back to 2011, four years before she ever interviewed with Charter.
Trial Tr. July 22 at 286 (testifying that she was bleeding through
her savings since her divorce in 2011); Pl. Closing Br. at 40 (citing to
both as evidence of recoverable financial distress damages).  The
position with Charter was one of many Plaintiff was pursuing and
Dykzeul's own position appears to be that she had been in a state of
continual financial distress from 2011 onwards.  At no point did she
believe she had secured the position, and there is no evidence that
she gave up pursuing other opportunities in order to apply to
Charter.  Nothing about being rejected by Charter materially
changed her financial situation.  Dykzeul has not shown she is
entitled to damages for financial distress caused by Charter's
decision not to hire her.

59.    Plaintiff did not suffer compensable economic distress from
Charter's decision not to hire her due to uncertainty over whether
she would have medical benefits that allow her to obtain expensive

but necessary medication.  She testified that she suffered severe emotional distress over Charter not hiring her because she needed a job with benefits otherwise "it could cripple me if I don't take the expensive medication that I have to take."  Trial Tr. June 21 at 296.  But this testimony alone does not establish that Charter's wrongful decision not to hire her was a but-for or proximate cause of any medication-related emotional distress, and there are no facts in the record on her costs or access to this medication at any point before or after her interview with Charter.  Notably, while Dykzeul's post-trial briefing argues that the lack of medication caused her compensable damages due to anxiety and stress, she never testified to experiencing that; she mentioned only her medication and the lack of health benefits as one of the reasons for why she changed jobs so many times.

60.    Dykzeul's last asserted source of damage from emotional distress comes from her inability to seek support from her family when Charter did not offer her the position because her family did not observe the Sabbath and this resulted in her feeling very alone and withdrawn.  Pl. Closing Br. at 42.  This is not cognizable emotional distress damage.  The Court is not privy to the nature of Dykzeul's relationship with her family members and how they view her practice of observing the Sabbath, nor has Plaintiff explained why her family members needed to share her faith in order for her to be able to talk to them about this incident.  There are simply far too many unexplained or missing facts for Dykzeul to establish compensable damages from emotional distress on this issue.

61.    The Court has already addressed some of the specific instances where Dykzeul's credibility was at the forefront of the trial.  To avoid any doubts, the Court has evaluated her credibility based on her memory, demeanor, financial motives, and in light of all other evidence – and generally found her testimony not to be

credible.[3]  See Model Civ. Jury Instr. 9th Cir. 1.14 (2021).  Her
testimony often felt highly exaggerated if not outright fabricated at
times, particularly with the level of details she could testify to when
those details built on her side of the story, but seemingly struggled
at times to remember much more basic details when being cross-
examined.  Indeed, the level of emotional pain exhibited while
testifying often appeared out of place given the actual facts she was
testifying to regarding events that often occurred five to ten years
before she took the stand in this case, as if her testimony reflected
an awareness that her testimony was the only basis for her claim of
$500,000 in emotional distress.

### *Punitive Damages[4]*

62.    To recover punitive damages, a Title VII plaintiff must
show that the employer engaged in discrimination "with malice or
with reckless indifference to the federally protected rights of [the
plaintiff]." 42 U.S.C. § 1981a(b)(1).  A finding of "malice" or "reckless
disregard" hinges on an employer's "knowledge that it may be acting
in violation of federal law, not its awareness that it is engaging in
discrimination." Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 535
(1999); see also id. at 536 (Employer may be liable for punitive
damages where it "discriminate[s] in the face of a perceived risk that
its actions will violate federal law.").

63.    Plaintiff is not entitled to punitive damages because she
has failed to establish malice or reckless disregard as defined by the
Supreme Court.  Id. at 535.  While "in general, intentional
discrimination is enough to establish punitive damages liability,"
courts have also acknowledged there are some circumstances when a
factfinder can find intentional discrimination, but the defendant is
not liable for punitive damages.  Passantino v. Johnson & Johnson

---

[3] However, the Court did find credible her testimony that her religious beliefs
were sincerely held.

[4] The Court previously granted Charter summary judgment on Dyzkeul's
request for punitive damages under FEHA.  MSJ Order at 20, dkt. 64.

Consumer Prods., Inc., 212 F.3d 493, 515 (9th Cir. 2000) (citing Kolstad, 527 U.S. at 536).  These include cases like this one "in which the employer discriminates with the distinct belief that its discrimination is lawful."  Kolstad, 527 U.S. at 537.  While Defendant did violate Title VII by failing to accommodate Dykzeul's religious beliefs, the evidence shows Swift made the decision because he incorrectly believed it was lawful do so because hiring her would require him to work every Sunday.

## III. CONCLUSION

Judgment shall be entered in favor of Teresa Dykzeul and against Charter Communications, Inc., on each of Dykzeul's claims under FEHA and for failure to accommodate under Title VII.  Based on the foregoing, for backpay and prejudgment interest Dykzeul is entitled to a judgment totaling $15,579.90.

IT IS SO ORDERED.

Date: August 9, 2022

Dale S. Fischer
United States District Judge